336 So.2d 881 (1976)
Felix BONURA and Felix Bonura Company, Inc.
v.
CHRISTIANA BROS. POULTRY CO. OF GRETNA, INC., et al.
No. 7270.
Court of Appeal of Louisiana, Fourth Circuit.
June 30, 1976.
Rehearings Denied August 31, 1976.
Writs Refused November 19, 1976.
*883 Bernard Marcus, Robert G. Stassi and B. Franklin Martin, III, Deutsch, Kerrigan & Stiles, New Orleans, for plaintiffs-appellees.
Robert R. Rainer, Baton Rouge, for the Collector of Revenue, State of Louisiana.
James Kenneth McCay and Frank L. Maraist, Baton Rouge, for Joseph Christiana.
Before REDMANN, LEMMON, BOUTALL, MORIAL and BEER, JJ.
BOUTALL, Judge.
This appeal involves the liability of a guarantor for an amount due on open account based on a continuing guaranty. It also involves the apportionment of some of the debtor's assets because of state tax liens.
In 1961, Nicholas (Nick) Christiana, Jr., Anthony Christiana and Joseph Christiana executed a continuing guaranty for the account of Christiana Bros. Poultry Co. of Gretna, Inc. (Christiana Bros.) and/or Christiana Bros. Poultry Co. of Baton Rouge, Inc. in favor of Felix Bonura Company, Inc. (Bonura Co.). For at least the next ten years, except for Joseph Christiana leaving New Orleans in 1967 and taking over the operation of the Baton Rouge Corporation, business was conducted without much incident. In November of *884 1972, however, in the face of a mounting open account indebtedness to Bonura Co., Anthony Christiana executed a personal note to Felix Bonura in the amount of $12,486.00, the proceeds of which were to be applied to the balance of the open account.
On August 7, 1973 Christiana Bros.' account had a balance of $67,809.73. On August 23, 1973, Anthony Christiana, President of Christiana Bros. assigned all the accounts receivable of the corporation to Bonura Co. pursuant to LSA-R.S. 9:3101, et seq.
Notice of the assignment was subsequently mailed to all the account debtors and some accounts were paid. At this time, Christiana Bros. also owed taxes to the State of Louisiana. A portion of the tax liability was secured by liens recorded prior to the assignment. The remainder was either unsecured or secured by liens recorded after the execution of the assignment. The Department of Revenue received some voluntary payments from Christiana Bros. and other payments were obtained by levying against certain of Christiana Bros.' accounts receivable.
On September 13, 1973 plaintiffs Felix Bonura and Bonura Co., filed suit against defendants, Christiana Bros., Anthony, Nick and Joseph Christiana, seeking recovery of $67,809.73 under the continuing guaranty agreement. Also included in the suit was a claim for the remaining balance of the note personally executed by Anthony.
On January 2, 1974 plaintiffs requested a temporary restraining order preventing Christiana Bros. and the Collector of Revenue from interfering with the collection of the assigned accounts receivable. They also sought to recover from the Department of Revenue all amounts previously collected and received from the account debtors of Christiana Bros. and all amounts collected and deposited into the registry of the court. The temporary restraining order was granted.
After trial on the merits, the district court rendered judgment in favor of plaintiffs in the sum of $67,809.73 plus 25% attorney's fees and costs. Judgment was also rendered against the State Department of Revenue in the amount of $11,933.71 representing collected accounts receivable, to be credited against the $67,809.73 judgment against defendants. The Clerk of the Twenty-Fourth Judicial District Court was further ordered to remit to Bonura Co. all amounts deposited in the registry of the court under the caption of this suit. Felix Bonura was also awarded the sum of $1,360.00 from Anthony Christiana representing the remaining balance on the note. Defendant, Joseph Christiana, and the State of Louisiana appeal. We affirm in part and reverse in part.
Due to the diversity of issues involved in this appeal, contentions of each appellant will be discussed separately.

JOSEPH CHRISTIANA
Defendant contends the trial court erred in: (1) failing to find that the continuing guaranty was no longer enforceable; (2) failing to hold that verbal notice was sufficient to terminate the continuing guaranty; (3) failing to find that the assignment of the accounts receivable and the collection of sums thereunder discharged the surety of his obligations under the continuing guaranty; (4) failing to find that the giving of the note by Anthony Christiana had the effect of discharging the surety on the continuing guaranty; and (5) awarding an attorney's fee of 25% of the amount in suit.
Defendant asserts that a continuing guaranty is a personal action which prescribes in ten years under LSA-R.C.C. 3544. We do not agree. It is recognized by all parties that a contract of continuing guaranty is equivalent to a contract of suretyship. See Brock v. First State Bank & Trust Co., 187 La. 766, 175 So. 569, 570 *885 (1937). As such, rights and obligations arising from it are accessory to the principal obligation. LSA-R.C.C. Art. 3035. In Louisiana Bank and Trust Co. v. Bouttee, 298 So.2d 884, 887 (La.App. 3 Cir. 1974), in determining the prescriptive period on a similar continuing guaranty agreement the court stated:
"Under our law, the suretyship undertaking is vitiated by prescription of the principal obligation. Therefore, normally the suretyship obligation depends for its vitality upon the prescriptive period applicable to the primary obligation involved. La.C.C. Art. 3060."
Although the Supreme Court subsequently amended the holding at 309 So.2d 274, 279 (1975), the opinion recognized that prescription on a guaranty does not begin to run until the principal indebtedness sued on arises. Hence, for the purposes of prescription, the date the agreement was signed is of no moment.
In the case at bar, the debts sought to be enforced under the continuing guaranty were incurred during the period November, 1972 through August 1973. As these debtors were on open account, they prescribe three years after they become due. LSA-R.C.C. Art. 3538. Suit was filed on September 13, 1973. Accordingly, since suit was filed clearly before the principal indebtedness had prescribed, the continuing guaranty remains enforceable.
Defendant argues that in the event we do not find the prescriptive period of LSA-R.C.C. Art. 3544 to be applicable, plaintiffs are nevertheless barred from enforcing the continuing guaranty because of estoppel or laches. He asserts that a 12 year delay in enforcement is unreasonable and that his rights were prejudiced thereby.
While delay in enforcing a right is an element of laches, it is not a sole consideration. Laches will only apply where the enforcement of the right asserted would work injustice. Labarre v. Rateau, 210 La. 34, 26 So.2d 279 (1946). We do not believe the circumstances of this case warrant a utilization of this doctrine. We point out that there were continuous sales from the time of confection of the continuing guaranty through August, 1973. The account was paid up into 1972. There was no need for the creditor to have called upon the guaranty until that time. Additionally, we note that during the entire period Anthony and Nicholas Christiana were bound for sales made to the Baton Rouge corporation.
We find nothing in the record to sufficiently demonstrate how the delay prejudiced appellant's rights to justify sustaining a plea of laches or estoppel. To the contrary the facts show that the intent of the parties was to provide a security device to Bonura to induce that company to sell chickens for an indeterminate period on credit to the Christiana companies: that the sales began immediately causing the continuing guaranty to become effective; that the sales continued within the knowledge of Joseph Christiana, keeping the continuing guarantee in effect. See, for example, Hibernia Bank & Trust Co. v. Succession of Cancienne, 140 La. 969, 74 So. 267 (1917); Interstate Trust & Banking Co. v. Sabatier, 189 La. 199, 179 So.80 (1937); Magnolia Petroleum Co. v. Harley, 13 So.2d 84 (La.App.1943).
The law is well settled that a continuing guaranty remains in force until revoked by the guarantor, expressly or impliedly; or its effectiveness is extinguished in some other mode recognized by law. Magnolia Petroleum Co. v. Harley, supra.
The guaranty agreement provides for termination on the part of the guarantors as follows:
"This guaranty shall continue in full force and effect until such time as you shall receive from us, written notice of revocation, and such revocation shall not in any way relieve us from liability for *886 any indebtedness incurred prior to the actual receipt by you in hand of said notice." (emphasis ours).
Defendant concedes that written notice of revocation was not given until August 7, 1973. He asserts, however, that a verbal notice of revocation, which he testified he gave to a now deceased exowner and officer of Bonura Co., given when defendant moved to Baton Rouge, was sufficient to terminate his liability under the continuing guaranty. Specifically, he argues that if the parties meant that the agreement could be revoked only by written notice, the phrase "written notice only" should have been used in the agreement.
We see no merit to this contention. The wording of the contract is clear and unambiguous. Revocation is to be carried out solely through the process of written notification. To hold otherwise would be in derogation of the true intent of the parties. LSA-R.C.C. Art. 1945.
Defendant contends that under the provisions of LSA-R.C.C. Art. 3062[1], the assignment of accounts receivable had the effect of fully discharging the sureties on the continuing guaranty. We do not agree. LSA-R.C.C. Art. 3062 contemplates full discharge of a surety only after acceptance of property in full payment of a principal debt. The assignment here was given for the purpose of reducing the open account indebtedness, and not for discharging same. Partial payment acts only as a pro tanto and not a full discharge of a surety's obligation. Mortgage Investment Co. v. Natal, 174 La. 91, 139 So. 768 (1932); Alexandria Bank & Trust Co. v. Honeycutt, 161 La. 261, 108 So. 475 (1926). Defendant remains bound.
Defendant next asserts that under the provisions of LSA-R.C.C. Art. 3063[2], the execution of the note by Anthony Christiana acted to relieve defendant of his liability under the continuing guaranty. We see no merit to this contention. Assuming for the moment that the note had the effect of prolonging the terms granted to the principal debtor (which we do not believe to be the case), defendant expressly waived his right to complain in the guaranty agreement. The agreement provides:
"Notice of acceptance of this guarantee, * * * of renewal or extension of any of said indebtedness, * * * are expressly waived." (emphasis added)
Clearly, this provision defeats defendant's assertion.
For the above reasons, we affirm the judgment of the district court holding defendant-appellant liable under the continuing guaranty agreement. However, we disagree with that portion of the judgment which awards attorney's fees and and we reverse the award of 25% of the amount of the judgment as attorney's fees.[3]
The conditions of the sales made by Bonura Co. to the Christiana Co. did not include attorney's fees but were simply sales on an open account. However, the continuing guaranty signed by appellant provided that:
"In event Felix Bonura Company, Inc. retains attorneys to effect collection pursuant to this guarantee, reasonable attorneys' fees and all costs expended in effecting such collection shall be paid by the undersigned." *887 We refer to LSA-R.C.C. Art. 3037 which provides:
"Art. 3037. Extent of suretyship obligation.
"Art. 3037. The suretyship can not exceed what may be due by the debtor, nor be contracted under more onerous conditions.
"It may be contracted for a part of the debt only, or under more favorable conditions.
"The suretyship which exceeds the debt or which is contracted under more onerous conditions shall not be void, but shall be reduced to the conditions of the principal obligation."
In the recent case of Trane Company v. Christina, 260 So.2d 62 (La.App.4th Cir. 1972) we held that where the principal obligation did not stipulate attorney's fees for enforcement (but the continuing guaranty did), the accessory promise of the surety cannot be enforced on more onerous conditions. The effect of this decision is sought to be avoided by placing the onus of attorney's fees upon the collection under the guaranty, not primarily upon the principal debt.
The net effect of such a condition is that guarantor dare not defend against the principal obligation without making himself responsible for attorney's fees, while the principal debtor is not responsible for such fees. We note that the creditor herein sued the principal debtor in solido with the guarantors and obtained judgment against them all. Must we then allocate what portion of the attorney's effort went to obtain judgment for the principal obligation and what portion he expended overcoming the defense arising under the guaranty?
The provisions of Art. 3037 are simple and clear. The suretyship with more onerous conditions is reduced to the same condition of the principal obligation. The condition stipulating attorney's fees is more onerous than the conditions of the principal obligation which do not so stipulate. The award of attorney's fees is disallowed, and that portion of the judgment is reversed.

STATE OF LOUISIANA
The State of Louisiana contends that the assignment of accounts receivable executed by Anthony Christiana as president of Christiana Bros. is invalid because it was not specifically authorized by the Board of Directors of the corporation. The trial court, while conceding that no signed corporate resolution existed granting Anthony express authority to execute the assignment, nevertheless, determined that Anthony had the authority, whether it was express, implied, or apparent, to execute the assignment. We find that in fact Anthony had implied apparent authority to execute the assignment.
Under the corporate by-laws Anthony, as president, was empowered with general and active management of the business. He did in fact manage all the business affairs of the corporation. Nick confined his affairs mainly to the loading platform. The corporation never observed any corporate formalities and in effect was run as a partnership.
Anthony testified that Nick approved the assignment. Nick's testimony reflects that although he was told about the assignment before it was executed, he never expressed an opinion of approval or disapproval. He admitted though that he knew what Anthony was trying to do and never attempted to stop him.
Bonura Co., being aware of no objections from Nick and knowing that Anthony managed the business and had in the past handled all the business affairs of the corporation, could reasonably infer that he had implied authority to grant the assignment. Christiana Bros. would therefore be responsible for this act executed within Anthony's apparent implied authority. J. Perez, S. A. v. Lousiana Rice Growers, Inc., 139 So.2d 247 (La.App.3rd Cir. 1962).
The State argues that due to the fact Nick did not sign a prepared corporate resolution, Bonura Co. was put on notice of *888 his non-consent and was estopped to rely upon Anthony's apparent implied authority. This conclusion lacks merit. The record establishes that at all times Bonura Co. was assured that Nick had agreed to the assignment and that he eventually planned to sign the resolution. No grounds for estoppel exist.
Having found that the assignment of accounts receivable is valid and enforceable, we turn now to its effect upon the State's tax liens. The State has recorded a total of five tax liens against Christiana Bros. Two of these liens, amounting to a total assessment of $15,225.27, were recorded prior to the August 1973 assignment. The question presented is, do these liens prime the assignment to the extent of the tax debts they secure? Although the trial court found otherwise, we answer in the affirmative.
The problem in reaching this determination arises from an apparent conflict between LSA-R.S. 9:3102 of the assignment of accounts receivable statute and the tax assessment provisions of LSA-R.S. 47:1577[4], 47:1578[5] and 47:1581[6]. LSA-R.S. 9:3102 provides:
"Every assignment of an account receivable evidenced in writing and made for a valuable consideration within the effective period of a statement of assignment made and filed for record as hereinafter prescribed shall be valid and shall be deemed and held to have been fully perfected at the time such assignment is made, notwithstanding that the debtor be not notified of or does not assent to such assignment; and thereafter no subsequent assignee, pledgee, purchaser or transferee of such account or other person claiming or to claim under, through or against the assignor, and no existing or future attaching, garnishing, judgment, execution, levying or other creditor of the assignor, except a creditor who through judicial proceedings shall have perfected a superior lien on such account prior to the time of such assignment, shall or can have or be entitled to any right, title, lien or interest in or to such account superior to or in diminution of that of such assignee therein or thereto."
This section requires that in order to prime the recorded assignment of accounts receivable, a creditor must have perfected a superior lien on such account "through judicial proceedings" prior to the time of such assignment.
The Department of Revenue assessed the two tax deficiencies against Christiana *889 Bros. and pursuant to LSA-R.S. 47:1577, recorded liens against the corporation on July 11 and 20, 1973. LSA-R.S. 47:1577 provides that the liens it creates "* * * shall affect third parties only from the date of recordation and shall take their respective ranks by virtue of recordation." Thus, mere assessment and recordation, without judicial proceedings per se, suffices under the taxation laws to give the State priority over third parties who subsequently perfect their rights.
We believe that in effect the procedure here employed by the State in collecting its taxes satisfies the requirements of LSA-R.S. 9:3102. LSA-R.S. 47:1561 specifies three alternative methods for the collection of taxes. Two of these methods utilize the courts and result in specific compliance with LSA-R.S. 9:3102. The other one, employed here by the Collector of Revenue, utilizes the simple non-judicial procedure of assessment and distraint. All three though have exactly the same effect. In fact, LSA-R.S. 47:1578(4) and LSA-R.S. 47:1581 provide that assessments are the equivalent of judgments. To require the State to give up its statutory choice of enforcement procedures and compel it to proceed through the courts in every situation where an assignment of accounts receivable might be possible is not the object of the accounts receivable statute.
LSA-R.S. 9:3101 et seq. is designed to provide for the assignment of accounts receivable without the necessity of giving notice to the debtors of the accounts assigned. Bossier Bank & Trust Co. v. Natchitoches Dev. Co., Inc., 272 So.2d 731 (La.App. 3 Cir. 1973), establishes that the purpose of LSA-R.S. 9:3102 is to secure the relationship between assignor and assignee by preventing debtors from ignoring a recorded assignment. A prior recorded tax lien, irrespective of the procedure through which it is enforced, does not in any manner serve to defeat this purpose. The specific procedure through which a tax lien is enforced affects only the relationship between the tax debtor and the State and should have no bearing whatsoever on the relationship between the tax debtor, as assignor, and the assignee. Recordation of a tax lien clearly gives notice to debtors and prospective assignees of a tax debtor that there is a valid claim against the property of the tax debtor.
Accordingly, we hold the two tax liens recorded in July of 1973 prime the assignment of accounts receivable executed on August 23, 1973 and recorded September 24, 1973. We reverse the judgment of the trial court to this extent.
Having found that the two tax liens prevail, we now reach the issue of imputation of payments. Prior to trial the State collected a total of $19,316.32 to be attributed to the tax obligations of Christiana Bros. This sum is broken down as follows:

Voluntary cash payment by company $ 5,015.61
Collections from account debtors 11,933.71
Sale of vehicles (before expenses) 2,367.00
 __________
 $19,316.32

Of the amount collected, the State imputed $3,963.38 to the tax lien recorded on July 11, 1973. The remainder was imputed to various unsecured tax obligations of Christiana Bros. Bonura Co. argues that the State should have imputed all payments to those debts secured by liens. We agree.
LSA-R.C.C. Art. 2166 provides:
"When the receipt bears no imputation, the payment must be imputed to the debt, which the debtor had at the time most interest in discharging, of those that are equally due; otherwise *890 to the debt which has fallen due, though less burdensome than those which are not yet payable.
"If the debts be of a like nature, the imputation is made to the debt which has been longest due; if all things are equal, it is made proportionally."
The jurisprudence interpreting this article has consistently held that a debtor has more interest in discharging a secured rather than an unsecured debt. Calatex Oil & Gas Co. v. Smith, 175 La. 678, 144 So. 243 (1932); Hammond Finance Co. v. Carter, 83 So.2d 682 (La.App. 1 Cir. 1955); Bedsole v. Lee, 78 So.2d 434 (La. App. 1 Cir. 1955). Accordingly, since the funds received from Christiana Bros. bore no directions as to imputation, all payments must first be imputed to their secured obligations. Further, by the clear wording of the article, the oldest among the secured debts must be discharged first.
The State relies upon LSA-R.C.C. Art. 2165 in support of its method of imputation. This article provides:
"When the debtor of several debts has accepted a receipt, by which the creditor has imputed what he has received to one of the debts specially, the debtor can no longer require the imputation to be made to a different debt, unless there have been fraud or surprise on the part of the creditor."
The cases decided under this article uniformly hold that the debtor waives his right to object to the imputation only when he has been given a receipt indicating the debt against which payment has been applied or when he has direct knowledge of the creditor's imputation of the payment. Marks v. Deutsch Construction Co., 258 So.2d 676 (La.App. 4 Cir. 1972); Romero & Sons Lumber Company v. Babineaux, 151 So.2d 714 (La.App. 3 Cir. 1963). The present record is devoid of any indication that Christiana Bros. was aware of or had ever been informed of the State's imputation of payments. Accordingly, the State's reliance upon this article is unfounded. The payments must be imputed in accordance with LSA-R.C.C. Art. 2166.
Based upon our prior determination that the two State tax liens in the total amount of $15,225.27 prime the assignment of accounts receivable, we now hold that all funds collected by the State must first be imputed to these liens. The excess must then be imputed to the remaining secured obligations. The State acted incorrectly in its original imputations.

DECREE
Considering the appeal of Joseph Christiana, IT IS ORDERED that the judgment in favor of Felix Bonura Company, Inc. against Joseph Christiana is affirmed, except that portion thereof awarding attorney's fees of 25% under the continuing guaranty, which is now set aside and reversed in favor of Joseph Christiana, disallowing attorney's fees.
Considering the appeal of the State of Louisiana, the judgment in favor of Felix Bonura Company, Inc. against the State of Louisiana, through the Department of Revenue, in the amount of $11,933.71 is set aside and reversed and there is now judgment rendered in favor of the State of Louisiana: decreeing that the two prior recorded tax liens prime the assignment of accounts receivable and the State of Louisiana is entitled to retain the full sum of $11,933.71 collected; ordering that all funds received by the State on behalf of Christiana Brothers Poultry Company of Gretna, Inc. be imputed as directed herein.
In all other respects, the judgment of the trial court is affirmed. Joseph Christiana is to pay all costs of the appeal.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
REDMANN, J., dissents for the reasons assigned by LEMMON, J.
*891 LEMMON, J., dissents and will assign reasons.
LEMMON, Judge (dissenting in part).

APPEAL BY JOSEPH CHRISTIANA
I disagree with the majority's position that the continuing guaranty was a contract of suretyship, and I dissent from the ultimate holding that, under the facts and circumstances of this case, Joseph Christiana's 1961 guaranty (which was merely an offer to become a surety) had not expired before the Bonura Company advanced credit on the open accounts which are the subject of this suit.
Operative Facts
In September, 1961 three Christiana brothers, Anthony, Nicholas and Joseph, incorporated their wholesale poultry business in Gretna, which they had formerly operated as a partnership.[1] The Bonura Company initially supplied the Christiana corporation with chickens, but soon threatened to cut off credit because of slow payments. When the brothers offered to personally guarantee the account, the Bonura Company agreed to continue extending credit, relying principally on Joseph Christiana's endorsement.
Accordingly, in December, 1961, the three brothers executed a "Continuing Guaranty Agreement", which provided:
"In consideration of your extending credit to Christiana Bros. Poultry Co. of Gretna, Inc. and/or Christiana Bros. Poultry Co. of Baton Rouge, Inc., we, and each of us jointly, severally and in solido, undertake and agree to guarantee, and each of us individually does guarantee, any and all obligations of Christiana Bros. Poultry Co. of Gretna, Inc. and/or Christiana Bros. Poultry Co. of Baton Rouge, Inc. only, without limitation, now owing, or which may in the future be incurred and owed, to Felix Bonura Company, Inc., for any reason whatsoever, up to but not to exceed the total sum of $250,000.
* * * * * *
"This guarantee shall continue in full force and effect until such time as you shall receive from us, written notice of revocation, and such revocation shall not in any way relieve us from liability for any indebtedness incurred prior to the actual receipt by you in hand of said notice."
The Bonura Company thereafter extended credit on a continuous basis to the two corporations.
In 1970 the Christiana brothers divided the stock in the two corporations, with Joseph divesting himself completely of all interest in the Gretna corporation.[2]
Thereafter, Anthony and Nicholas owned and operated the Gretna corporation, and Joseph owned and operated the Baton Rouge corporation, although both corporations continued to purchase chickens from the Bonura Company. Felix Bonura, president of the Bonura Company, testified he was immediately aware of the division of the operations and soon learned that Joseph Christiana had divested himself completely of any interest in the Gretna corporation. However, Joseph Christiana did not revoke the continuing guaranty in writing.
The account charges on which this suit is based occurred between November, 1972 and August, 1973, long after Joseph Christiana had left the Gretna business.
In November, 1972, after the account had become delinquent, Anthony Christiana executed a bank loan in the amount of $12,486.00, and the note was personally endorsed by Felix Bonura. Since the loan proceeds were used to pay off the corporation *892 account, the effect of Bonura's action was to relieve the corporation (and all sureties) of liability for the $12,486.00.
By March, 1973, the new account balance had risen to over $14,000.00, and no further charges were made to that account ledger, which thereafter showed only numerous $300.00 payments (down to $7,880.57). Apparently another account (entitled the "Current Account") was started in March, 1973, and between then and August 7, 1973 purchases totaled about $300,000.00 and payments totaled over $240,000.00, the balance as of the later date amounting to over $46,000.00. Charges of about $20,000.00 in N.S.F. checks were also debited to the account in August, and the business ultimately closed operations.
The Bonura Company then sued the Christiana corporation on the open account and the three brothers on the continuing guaranty. After trial on the merits, judgment was rendered against the corporation and the three individuals in the amount of $67,809.73. Only Joseph Christiana appealed.
Applicable Law
A continuing guaranty is not a completed contract of suretyship, but rather is a continuing and divisible offer to guarantee repayment of a loan or payment for goods soldin effect, to become a surety.[3]Trane Co. v. Christina, 260 So.2d 62 (La. App.4th Cir. 1972). If the offeree timely accepts the offer by making a loan or by selling goods on credit, an irrevocable contract results. Texas Co. v. Hudson, 155 La. 966, 99 So. 714 (1924). However, an offer to become a surety is not binding upon the offeror until it is accepted by the offeree. Texas Co. v. Hudson, supra. Only upon acceptance does the original offeror become surety for the debtor, and then only as to that particular debt.
Of course, the offer which is extended by means of a continuing guaranty (just as any other offer) may be revoked before acceptance. Even after one or more contracts have been made under the standing offer, revocation prevents consummation of any further contracts. Corbin, Contracts § 53 (1952).
The crucial issue in the present case is whether Joseph Christiana's 1961 offer was revoked or otherwise expired before the credit was extended in 1972 and 1973.
The basic fallacy in the majority opinion is the reasoning that the "contract" obliged Joseph Christiana to provide written notice of revocation. Since the document was not a contract (but only a written offer), Joseph Christiana had no such obligation. There can be no obligation on the offeror unless he holds a right against another who is obligated. Unless both the offeror and offeree are obligated, neither is obligated (except insofar as the offeror may be obliged to keep the offer open for a reasonable length of time as a binding effect of his unilateral declaration of will).
Under the Civil Code an offer (not being a completed contract until accepted) is revocable before acceptance, but the offeror must allow "such reasonable time as from the terms of his offer he has given, or from the circumstances of the case he may be supposed to have intended to give to the party, to communicate his determination." (Emphasis supplied) C.C. art. 1809. Thus, an offeror binds himself by a mere offer only for a reasonable time. Furthermore, since an unaccepted offer is not a contract, and since the offeror receives no consideration for merely making the offer, he incurs no enforceable obligation to keep the offer open beyond a reasonable time, and the offer may lapse or the offeror may expressly or tacitly revoke the offer, regardless of the written terms.
*893 The offer does not remain open for an unlimited time even if the offeree (who has no obligation whatsoever prior to acceptance) exacted contrary language in the written offer.[4]
The determination as to what is a reasonable period of time for acceptance depends upon the facts and circumstances of the particular case. Acceptance need not be made immediately after the offer, but is timely if made before the offeror changes his mind "or may reasonably be presumed to have done so . . . ." C.C. art. 1804.[5] If there is a change in the offeror's intention, there can be no contract because of the lack of an accord of the wills, which is an essential element of any contract. Litvinoff, Offer and Acceptance in Louisiana Law: A Comparative Analysis, XXVIII La.L.Rev. 1, 35 (1967).
Under the facts of the present case Joseph Christiana must reasonably be presumed to have changed his intention about his offer to become surety for the Gretna corporation (at least as to future credit) when he sold all interest in the Gretna corporation, changing his position entirely from that which he occupied when he executed the agreement. The offer expired (or was tacitly revoked) when it became known to all parties that circumstances had changed so drastically between the time of execution of the guaranty and the time of the purchases at issue that he could not reasonably be presumed to intend to continue the offer in effect. Since at the time of these purchases there was no accord of the wills, there was therefore no contract.
The strongest argument for holding Joseph Christiana liable was that the Bonura Company extended credit in reliance on the guaranty which had not been revoked in writing. The determination of reliance, however, is merely a corollary of the determination of "may reasonably be presumed to have done so" under C.C. art. 1804. If the circumstances establish that the offeror should reasonably be presumed (by the offeree) to have changed his mind, then the same circumstances indicate that the offeree did not accept (by extending credit) in reliance on the offer still being open.
The record does not support the conclusion that the Bonura Company relied upon Joseph Christiana's endorsement after the early years of operations. Felix Bonura knew, years before the purchases at issue, that Joseph Christiana had divested himself of all stock ownership in the Gretna corporation. Furthermore, there was testimony that the Gretna corporation earned a half million dollars in its first five years of operation, from which a reasonable (although not conclusive) inference can be drawn that Bonura no longer relied as heavily on Joseph Christiana's original guaranty. Finally, when the delinquent account balance mounted in late 1972, Felix Bonura arranged and personally endorsed a bank loan for Anthony Christiana, indicating his complete reliance to that extent on that party. At no time did Bonura warn Joseph Christiana of the mounting indebtedness or of potential liability therefor.
Under the facts and circumstances of this particular case, Joseph Christiana's 1961 offer to become surety for the account of the Gretna corporation was no longer subject to acceptance at the time of *894 the charges at issue in this suit.[6] The judgment holding him liable should be reversed.

APPEAL BY THE STATE OF LOUISIANA
Overshadowed by the prominence of the continuing guaranty issue is the following unrelated issue: Does the State's filing of an assessment of sales and franchise taxes in the immovable property records make its lien then effective so as to outrank other claimants against movable property? The majority rules that it does, and I disagree.
R.S. 47:1577 provides that a tax obligation shall operate as a privilege on all property of the tax debtor, both movable and immovable, but shall affect third parties only from the date of recordation and shall take rank by virtue of recordation. Thus, Section 1577, while speaking of a privilege on movable property, limits its priority to that resulting by virtue of recordation. Mere recordation, however, affords no priority whatsoever as to movables.
As to R.S. 47:1581's provision that "the recordation of such assessment shall have the same effect as the recordation of a judgment", the effect of recordation of a judgment is a judicial mortgage against immovables in the parish of recordation. Therefore, even without regard to the obvious due process problem, we should not interpret these statutes as requiring that mere recordation of a tax lien in the immovable mortgage records results in a privilege which affects movable property and outranks subsequent claimants. Accordingly, the critical date in ranking the State's privilege on the accounts receivable should be the date of distraint, not the date of recordation.
The assignment of accounts receivable assigned claims against named customers, and the assignee gave notice of the assignment to those customers five or six days before the State notified them of its seizure of those accounts.[7] By the time the State seized, the accounts had already been effectively transferred under ordinary assignment law. C.C. art. 2643. Therefore, the accounts receivable belong (in pledge) to Bonura, except for the sales taxes included in the receivables and not previously paid to the State.
NOTES
[1] "The voluntary acceptance on the part of the creditor, of an immovable or any other property, in payment of the principal debt, is a full discharge of the surety, even in case the creditor should be afterwards evicted from the property so accepted."
[2] "The prolongation of the terms granted to the principal debtor without the consent of the surety, operates a discharge of the latter."
[3] The dissenting judges express no opinion on this issue but agree in result.
[4] "Except as is specifically provided in the laws regulating building and loan associations, any tax, penalty, interest or attorney fee due under the provisions of this Sub-title, shall operate as a lien, privilege and mortgage on all of the property of the tax debtor, both movable and immovable, which said lien, privilege and mortgage shall be enforceable in any court of competent jurisdiction in an action, at law, or may be enforced as otherwise provided by this Sub-title. The collector may cause notice of such lien, privilege and mortgage to be recorded at any time after the tax becomes due, whether assessed or not, and regardless of whether or not then payable, in the mortgage records of any parish wherein the collector has reason to believe the tax debtor owns property. The lien, privilege and mortgage created by this section shall affect third parties only from the date of recordation and shall take their respective ranks by virtue of recordation."
[5] "* * * * (4) Notwithstanding any other provision of this Chapter, the collector, subject to the approval of the board of tax appeals, may compromise any judgments for taxes (including assessments, they being equivalent to judgments) which have been outstanding for more than three years, if no payments have been received during the eighteen months preceding the compromise and if in his opinion such action is in the best interest of the state. A complete record of all such compromises shall be kept by the collector and shall be open to public inspection."
[6] "Any tax, penalty, interest or other charges duly assessed under this Sub-title, being the equivalent of a judgment, shall not be subject to the running of any prescription other than such prescription as would run against a judgment in favor of the State of Louisiana in accordance with the Constitution and laws of this state; and the recordation of such assessment shall have the same effect as the recordation of a judgment."
[1] There was also a Christiana Bros. Poultry Co. of Baton Rouge, Inc., but the record does not show the date of incorporation.
[2] This division occurred after the Gretna corporation had "trouble with Mercantile Finance out of Ohio . . . ."
[3] Common law theories of contract concur in this conclusion. Corbin, Contracts § 76 (1952) describes a continuing guaranty as an offer which empowers the offeree to accept many times. 38 Am.Jur.2d, Guaranty, § 1 (1968) also characterizes the continuing guaranty as an offer.
[4] In the present case Joseph Christiana did not give written notice of his intention to revoke the offer until after the charges had been incurred. However, since the continuing guaranty agreement (apparently prepared by Bonura) was not a contract, but merely an offer, Christiana was not bound by any terms of the mere offer purporting to continue the offer in effect beyond a reasonable period of time.
[5] C.C. art. 1804 provides:

"The acceptance needs [need] not be made by the same act, or in point of time, immediately after the proposition; if made at any time before the person who offers or promises has changed his mind, or may reasonably be presumed to have done so, it is sufficient."
[6] Arguably, Anthony and Nicholas Christiana, whose percentage interest in the Gretna corporation increased after the division, maintained their offer (although over ten years old) in effect and were personally liable on the account. Judgment was rendered against them personally, but since no appeal was taken by them, the issue as to their personal liability was not before this court.
[7] The assignment did not contain the address of the principal place of business of the assignor and assignee. See R.S. 9:3103.