**MILLIKEN AND COMPANY, f.k.a. Deering Milliken, Inc., Appellant,**

v.

**EAGLE PACKAGING COMPANY, INC. et al., Defendants,**

and

**Dorn H. Sticha, Respondent.**

**No. 50352.**

Supreme Court of Minnesota.

July 3, 1980.

Robins, Davis & Lyons and Michael L. Meyer, Minneapolis, for appellant.

Stuart E. Gale, Bloomington, for respondent.

Heard before TODD, YETKA, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Plaintiff Milliken and Company (hereinafter, Milliken) brought this action on a debt owed by defendant Eagle Packaging Company, Inc. (hereinafter, Eagle) and personally guaranteed by defendants Fred Schwenk and Dorn Sticha. Defendants Eagle and Schwenk failed to answer the complaint, and default judgment was entered against them. The Hennepin County District Court found that defendant Sticha had orally revoked his written personal guaranty and entered judgment in his favor. Plaintiff appeals, arguing that Sticha's personal guaranty expressly requiring written notice of revocation was not revoked by oral notice to plaintiff's sales representative. We reverse.

Defendant Eagle Packaging Company, Inc. was organized in the summer of 1974 to engage in the business of packaging fruit juices. Defendants Schwenk and Sticha each owned half of Eagle's stock. In 1975, Eagle entered into a business relationship with plaintiff Milliken in which Milliken provided Eagle with a packaging machine, the T–300, on a rental basis, along with

packaging materials, parts, and service. A lease agreement for the T–300 was signed July 30, 1975. Beginning in late 1975, Milliken extended credit on Eagle's account. By 1976, the Eagle account was approximately $5,000 in arrears.

In January or February of 1976, Eagle placed an order through Milliken's midwest sales representative, David Nicolai, to lease a second packaging machine, the VT–25. James Rohrbach, a credit analyst with Milliken, agreed, in light of Eagle's uncertain financial condition, to fill the order and keep Eagle's account open on the conditions that Eagle bring its open account current and that Schwenk and Sticha personally guarantee Eagle's future indebtedness. On March 9, 1976, Sticha signed a personal guaranty form provided by Milliken, which provides, inter alia, "This is a continuing and unconditional guarantee and shall continue until revoked by written notice sent to [Milliken] by registered mail to the above address and received by it."

Although Eagle wanted the VT–25 operating in February 1976, it was not delivered until August. Sticha testified that he was told that the machine intended for Eagle was sent instead to Beatrice Foods, which packages frozen novelties for Burger King. Nicolai indicated on cross-examination that he "may have" told Sticha or Schwenk that a machine meant for them had been shipped elsewhere. Rohrbach, however, testified that production and shipment of the VT–25 for Eagle was not authorized until after the Eagle account had been brought up to date.

The lease agreement for the VT–25 was executed June 16, 1976. Sticha testified that, because the delay in delivery of the VT–25 meant that it would not be available in time to tap the summer market for frozen novelties, he opposed this investment. Sometime in late April or May 1976, he met with David Nicolai at Eagle's France Avenue offices. Later, the meeting moved to the Ramada Inn bar. Sticha told Nicolai that he was willing to "relinquish my portion of Eagle Packaging to Fred [Schwenk] or to Roger Mitchell or to whoever. * * I wanted to rescind that personal guarantee

and what procedure should be used for me to come out from any future obligations to Eagle Packaging with Milliken." Sticha testified that Nicolai "told me at that time that he would notify the company, that he would take care of it and that is basically the extent of it." Nicolai testified that neither Sticha's role in the corporation nor the personal guaranty he signed was discussed at the France Avenue/Ramada Inn meeting.

Sticha indicated that, after the Eagle account was paid up to date in May 1976, he resigned as president, "turned over" the stock he owned in his wife's name, and ceased being a signator in the Eagle bank account. However, for several months thereafter, he contacted Schwenk for reports on Eagle's business. Papers signed by Sticha in connection with his withdrawal documented the continuing financial obligation from Eagle to Sticha of at least $13,000, part of which represents Sticha's original investment in Eagle. The documents further provided for sale of half of the corporation stock to Roger Mitchell, conditional on Mitchell's obtaining financing available to him as a member of a racial minority. On cross-examination, Sticha was asked whether Mitchell had in fact obtained financing, without which the stock transfer was "null and void." Sticha responded, "I wouldn't know. Apparently not." James Rohrbach testified that he first became aware of the change in Sticha's involvement with Eagle in November of 1976 but that he was never informed that Sticha had completely withdrawn from the corporation.

Sometime early in the summer of 1976, Eagle headquarters were moved from their former France Avenue South location to an address on 12th Avenue South. Rohrbach became aware of that move in October or November of 1976 but was not concerned by the address change; he continued dealing with Schwenk, the Eagle principal with whom he had always dealt. Until late June or July of 1976, Nicolai met with both Schwenk and Sticha; thereafter, he dealt exclusively with Schwenk. In the spring of

1977, the T–300 and VT–25 formerly rented by Eagle were assigned by Milliken to a new business entity, Phoenix Foods, organized by Schwenk and Roger Mitchell, a consulting engineer who had shared office space with Eagle at least since early 1975.

This action was brought to collect indebtedness accruing in Eagle's account between May 1976 and April 1977, in the amount of $17,357.97. Defendants Eagle and Schwenk defaulted. The trial court found that, at the France Avenue/Ramada Inn meeting, David Nicolai assured Sticha that Nicolai would notify Milliken of Sticha's revocation of the guaranty, that Nicolai acted within his apparent authority in doing so, and that Sticha relied on those assurances.

The issues presented by this appeal are (1) whether a written personal guaranty requiring written notice of revocation may nevertheless be revoked orally and (2) whether the doctrines of partial performance and equitable estoppel preclude Milliken from enforcing the guaranty.

1. The guaranty Sticha signed expressly provides that it "shall continue until revoked by written notice" to Milliken. Milliken argues that any oral communications which may have occurred between Sticha and Nicolai could not operate to release Sticha from liability under the terms of the guaranty.

New York law supports plaintiff's position.[1] Its statute of frauds provision states:

1. A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

\*    \*    \*    \*    \*    \*

4. If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent. N.Y.Gen.Oblig.Law § 15–301 (McKinney) (1963). These provisions were enforced by New York's highest court in *Chemical Bank v. Wasserman*, 37 N.Y.2d 249, 333 N.E.2d 187, 371 N.Y.S.2d 919 (1975). There, defendant had signed an agreement in 1967 personally guaranteeing a loan from the bank to a corporation. The guaranty in that case, like the one Sticha signed, was continuing in nature and expressly provided that it could be terminated only by written notice to the bank. In 1970, the corporation satisfied its 1967 indebtedness and took a second loan, on which it subsequently defaulted. Like Sticha in the instant case, Wasserman admitted she had never given written notice of revocation required by the guaranty but contended "that her obligations under the 1967 guaranty were orally terminated by an officer of the respondent bank in 1970." 37 N.Y.2d at 251, 333 N.E.2d at 188, 371 N.Y.S.2d at 920. The court, however, held that under § 15–301, "the alleged oral notice is completely ineffectual to terminate appellant's obligations under the written guarantee which here specifically provided that it could not be modified or terminated, unless such modification or termination was communicated to the respondent in writing [citations omitted]." *Id.* at 252, 333 N.E.2d at 188, 371 N.Y.S.2d at 920. In the face of § 15–301, the court refused to recognize the common-law rule that a written agreement may be orally terminated, because the agreement expressly required termination in writing. *Cf. Associated Food Stores, Inc. v. Siegel*, 10 A.D.2d 1003, 205 N.Y.S.2d 208 (1960), *aff'd*, 9 N.Y.2d 816, 175 N.E.2d 343, 215 N.Y.S.2d 764 (1961).

---

1. The guaranty provides: "This agreement \*  \* shall be governed by the Laws of the State of New York." This court is "committed to the rule" that parties may agree that the law of another state shall govern their agreement and will interpret and apply the law of another state where such an agreement is made. *Combined Insurance Co. of America v. Bode*, 247 Minn. 458, 464, 77 N.W.2d 533, 536 (1956).

Recent New York case law follows *Chemical Bank v. Wasserman. See Bank of New York v. Progressive Phone Systems, Inc.*, 71 A.D.2d 1010, 420 N.Y.S.2d 421 (1979); *Joy v. Heidrick & Struggles, Inc.*, 93 Misc.2d 818, 403 N.Y.S.2d 613 (1977); *Chemical Bank New York Trust Co. v. Liebman*, 50 A.D.2d 492, 379 N.Y.S.2d 69 (1976); *First National City Bank v. Cooper*, 50 A.D.2d 518, 375 N.Y.S.2d 118 (1975).

▇ Responding to this argument, Sticha cites *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 366 N.E.2d 1279, 397 N.Y.S.2d 922 (1977), where the New York high court enforced an oral modification reducing the quantity of land to be conveyed under a written contract. In that case, however, the court found that both purchasers, who sought the modification, and sellers, through their attorney and in a letter to the purchasers, took action referable to the oral modification and inconsistent with the writing. Thus, the oral modification was not an "executory" agreement forbidden by § 15–301, subd. 1. *See Joy v. Heidrick & Struggles, Inc.*, 93 Misc.2d 818, 822–23, 403 N.Y.S.2d 613, 616 (1977). ("Since the alleged termination was prospective * * *, the contract was still executory and GOL § 15–301, subds. '1.' and '4.', including its written requirements, applies herein.") The *Rose* court reiterated the thrust of § 15–301's rule against oral modification and of the *Wasserman* decision, stating, "if the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls." 42 N.Y.2d at 343, 366 N.E.2d at 1282, 397 N.Y.S.2d at 926.[2]

▇ 2. We are not persuaded that the doctrines of partial performance and equitable estoppel, identified in *Rose v. Spa Realty Associates*, 42 N.Y.2d 338, 366 N.E.2d 1279, 397 N.Y.S.2d 922 (1977) as theories under which defendant urges enforcement of an oral modification of a written contract, preclude Milliken from enforcing Sticha's oral guaranty. The *Rose* opinion makes clear that under either of these theories, the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is "unequivocally referable" to the oral modification and incompatible with the contract's written terms. 42 N.Y.2d at 341, 344, 366 N.E.2d at 1281, 1283, 397 N.Y.S.2d at 924, 927. Such a showing was not made here. Sticha's withdrawal from active participation in Eagle's business, and Milliken's and Schwenk's acquiescence in that withdrawal, are not inconsistent with his guaranty, the writing whose requirements he seeks to avoid. Often, a principal shareholder will personally guarantee the debts of a corporation which he is not directly involved in managing. Even if Sticha personally paid the $5,000 which Eagle owed Milliken in May 1976, which was not established, that would not demonstrate his detrimental reliance on the alleged oral revocation. The $5,000 payment was a debt owed by Eagle to Milliken and guaranteed by Sticha; it cannot constitute fresh consid-

2. *Compton Advertising, Inc. v. Madison–59th Street Corp.*, 91 Misc.2d 768, 398 N.Y.S.2d 607 (1977), aff'd, 63 A.D.2d 942, 407 N.Y.S.2d 436 (1978), cited and discussed by defendant's counsel at oral argument, accords with these cases. In that case, plaintiff tenant made an oral agreement with defendant landlord by which the landlord waived his right to collect electricity rate increases as part of plaintiff's rent. Over the following three years, defendant failed to give plaintiff notice of five rate increases or demand payment based on them, and in fact deliberately concealed the increases during negotiations respecting other charges. The court found waiver of the landlord's rights under the written lease "by action and agreement," noting that the landlord's three-year si-

lence was consistent only with waiver. Where there is no such conduct consistent with an oral modification and inconsistent with the original terms of the agreement, the statute of frauds remains operative: "To the extent that it is executory an oral waiver is insufficient to modify a written agreement containing a provision against oral modification." 91 Misc.2d at 778, 398 N.Y.S.2d at 613.

Moreover, as appellant notes, *Rose v. Spa Realty Associates* and *Compton Advertising* interpret only subdivision 1 of § 15–301, concerning oral *modification* of a written contract. Subdivision 4 of that section specifically prohibits oral *revocation* of a contract which by its terms requires revocation in writing.

eration for release from the continuing guaranty.

Milliken's assignment of the packaging machinery, the security for Eagle's debt, to Phoenix Foods similarly does not operate to release Sticha from liability. There was evidence that neither Nicolai nor Rohrbach made any effort after May 1976 to contact Sticha regarding Eagle's delinquency or to reclaim the machinery. Rohrbach, however, was not aware that Sticha's involvement in Eagle's business had changed until November 1976. Moreover, as Milliken notes, the assignment of the leased machinery to Phoenix Foods actually reduced Sticha's liability by terminating the contract between Eagle and Milliken at that point.

■ Sticha admittedly retains a financial interest in Eagle. His transfer of stock ownership to Roger Mitchell never became effective. He has not yet recovered the portion of his initial investment which he expects to recover from the Eagle enterprise. Sticha has pointed to no action on the part of Milliken which is consistent with his revocation and inconsistent with his continuing guaranty. In these circumstances, where the only proof of an alleged agreement to deviate from a written contract is the oral exchanges, the writing controls.

■ The personal guaranty Sticha signed expressly requires written notice to Milliken to revoke. His alleged oral communications to Nicolai do not operate to satisfy that requirement under New York law.[3] Sticha presented no evidence of conduct on Milliken's part or reliance on his own part which is clearly referable to revocation of the guaranty and inconsistent with its terms. Because of our resolution of these issues, we need not consider Milliken's challenge to the trial court's determination that David Nicolai had apparent authority to accept oral notice of Sticha's revocation.

3. *Accord, Browning v. National Bank of Georgia*, 143 Ga.App. 278, 238 S.E.2d 275 (1977); *Bonura v. Christiana Brothers Poultry Co.*, 336 So.2d 881 (La.App.1976); *Haynie v. First National Bank of Atlanta*, 117 Ga.App. 766, 162 S.E.2d 27 (1968).

Reversed and remanded for entry of judgment for plaintiff, with reasonable attorneys fees as provided for by the terms of the guaranty.

This court, too, has expressed its commitment to enforcing the clear terms of a written guaranty. See *Midland National Bank v. Security Elevator Co.*, 161 Minn. 30, 200 N.W. 851 (1924).