**MODERN COMPUTER SYSTEMS, INC., Appellant,**

v.

**MODERN BANKING SYSTEMS, INC.; Modern Banking Systems of Southern Wisconsin, Appellees.**

No. 88–1393.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 8, 1988.

Decided March 29, 1989.

Charles B. Rogers, Minneapolis, Minn., for appellant.

James P. Fitzgerald, Omaha, Neb., for appellees.

Before LAY, Chief Judge,
HEANEY,* McMILLIAN,** ARNOLD,
JOHN R. GIBSON, FAGG, BOWMAN,
WOLLMAN, MAGILL and BEAM,
Circuit Judges, en banc.

MAGILL, Circuit Judge.

Modern Computer Systems, Inc. (MC) appeals from the district court's[1] denial of its motion for a preliminary injunction pending a ruling on the merits of its claims against Modern Banking Systems, Inc. (MB). The gravamen of MC's case is that MB may not lawfully terminate MC as its computer software distributor or market software in MC's exclusive sales territory. MC alleges, *inter alia*, that violations of the Minnesota Franchise Act, Minn.Stat. Ch. 80C (1986 and Supp.1987), committed by MB necessitate the requested injunctive relief.

The district court based its denial of MC's motion on two findings. First, it

concluded that because of a choice of law clause in the MC–MB contract, Nebraska law (not the Minnesota Franchise Act) must govern all disputes between the parties arising from the contract. Second, the court found that MC failed to carry its burden to prove that MB's actions caused the irreparable injury integral to any request for injunctive relief.

On appeal, a panel of this court, in a 2–1 decision, reversed the district court's judgment, finding that "the Minnesota Franchise Act should be applied * * *" and that "Modern Computer has shown a likelihood of success on the merits * * *." *Modern Computer Systems v. Modern Banking Systems*, 858 F.2d 1339 (8th Cir. 1988). That decision was vacated when rehearing en banc was granted. On rehearing, the court en banc voted (8–2 decision) to affirm the judgment of the district court. Since the district court did not err in its conclusions that the choice of law clause is enforceable and that MC failed to prove irreparable injury, MC's motion is denied.

## I. BACKGROUND

On October 22, 1980, MC and MB signed a contract that gave MC exclusive rights to distribute MB's computer software in Minnesota. The distributorship agreement was a standard form contract with preset, nonnegotiable terms. The contract included a clause establishing that if the agreement engendered litigation between the parties, the laws of Nebraska (MB's place of business) would govern.

The contract authorized MC to distribute computer systems created by MB. The hardware in the systems came from the Texas Instruments Corporation. The accompanying software was designed and developed by MB. Although it could have purchased hardware directly from Texas Instruments, MC paid MB a premium price

---

* The Honorable Gerald W. Heaney assumed senior status on December 31, 1988.

** The Honorable Theodore McMillian concurred in the majority opinion but did not participate in the final vote on the opinion due to illness.

1. The Honorable Lyle E. Strom, United States Chief District Judge for the District of Nebraska.

for it in order to obtain MB software (which facilitates use by commercial banking establishments) as well.

By 1987, MC had purchased over $3.6 million worth of computer systems from MB and amassed a client list of eighty-six financial institutions in the region in which it distributed MB systems. MC grew from a two-man "start up" operation to a thriving company with twenty-five employees. However, to a substantial degree, it remained financially dependent on its continuing relationship with MB; over seventy percent of MC's business was in some respects related to the sale and maintenance of MB systems and the sale of supplies required by MB systems purchasers.

As MC expanded, it installed computer systems in more than 400 institutions throughout the United States. All of its commerce outside of Minnesota and North Dakota was entirely unrelated to MB and its products. MC's distribution zone for MB products grew from Minnesota alone to a region comprising Minnesota, North Dakota and, for two years, South Dakota. In 1983, MC sought to expand into Wisconsin, but MB prevented it from doing so by threatening to enter the Minnesota market as a direct competitor if MC's expansion plans persisted.

In 1986, MB decided to convert its distributors into licensees. With the exception of MC, all of the erstwhile distributors acceded to MB's demand for a new licensor-licensee arrangement. Because MC refused to alter its contract, MB began to charge MC, as a distributor, more for its software than it charged licensees.

Alarmed by the way its relationship with MB had deteriorated, MC filed suit against MB in Minnesota state court on August 4, 1987. MC requested a declaration of its rights under the distributorship agreement as they pertained to (1) whether MC could expand into the Wisconsin market; (2) whether MB could require MC to purchase its Texas Instruments hardware; (3) whether MB could require hardware/software tie-in sales; and (4) whether MB's policy of charging distributors more than licensees was lawful.

The suit was dismissed on October 20, 1987. The Minnesota district court exercised its discretionary right not to assert jurisdiction because the parties, in the distributorship agreement's forum selection clause, agreed "to exclusive venue in Douglas County, Nebraska in any litigation between them concerning this contract." *Modern Computer Systems v. Modern Banking Systems*, No. 104618, slip op., Dakota County, Minnesota, October 20, 1987 (unpublished memorandum opinion).[2]

The court supported its decision to enforce the forum selection clause with Minnesota Supreme Court precedent:

> "[W]hen the parties to a contract agree that actions arising from that contract will be brought in a particular forum, that agreement should be given effect unless it is shown by the party seeking to avoid the agreement that to do so would be unfair or unreasonable." Minnesota law, therefore, favors the enforcement of forum selection clauses.

*Id.* (quoting *Hauenstein & Bermeister, Inc. v. MET–FAB Industries, Inc.*, 320 N.W.2d 886 (Minn.1982)).

In addition to emphasizing that Minnesota law favors the enforcement of clearly worded and otherwise not unreasonable forum selection clauses, the Minnesota district court obliquely raised another rationale for denying MC's motion: MB's actions caused no irreparable harm to MC. The court reasoned that "[t]here is no evidence * * * that [MC] could not have acquired computer software suitable for banking from any other source. Plaintiff

---

**2.** Ordinarily, we do not cite unpublished opinions in this circuit. Eighth Circuit Local Rule 8(i) indicates that "[no] party may cite an opinion that was not intended for publication by this or any other federal or state court * * *." However, Rule 8(i) goes on to make an exception "when the cases are related by virtue of an identity between the parties or the causes of

action." Since the parties and underlying disputes in the instant case are identical to those in the Minnesota district court case, Rule 8(i) authorizes this citation. *See, e.g., Jones v. Mabry,* 723 F.2d 590, 596 (1983) (there is no impropriety in the use of an unpublished opinion when causes of action are identical).

himself states he can purchase the computer hardware directly." *Modern Computer Systems v. Modern Banking Systems*, No. 104618, slip op., Dakota County, Minnesota, October 20, 1987 (unpublished memorandum opinion).

After the dismissal of MC's state claim, MB commenced a breach of contract action against MC in Nebraska state court.[3] The litigation continued to flourish, as MC filed the instant action in the United States District Court for the District of Nebraska. MC's new suit contained a multitude of allegations, charging MB with interference with prospective contractual relations, defamation, breach of contract, promissory estoppel, antitrust violations, unfair competition, and violations of the Minnesota Franchise Act and the Wisconsin Fair Dealership law. MC sought a preliminary injunction forbidding the termination of the MC–MB distributorship agreement and MC–MB competition in Minnesota pending ruling on the merits of MC's claims. ·

The district court, emphasizing the absence of irreparable injury, also denied MC's motion for a preliminary injunction.[4] Ultimately, the court concluded that MC would not be pushed to the brink of extinction (with irreparably damaged goodwill and reputation) absent injunctive relief. On the contrary, the court concluded MC could survive, perhaps nearly financially intact, by pursuing other avenues of business, viz., maintenance service and emphasis on clients outside Minnesota and North Dakota. The district court also analyzed the distributorship agreement's choice of law clause, concluding that the parties' selection of Nebraska law to govern disputes arising out of the agreement was enforceable since it was reasonable, agreed upon mutually in clear language, and not con-

trary to the laws or fundamental policies of Minnesota. Accordingly, the court denied MC's request for injunctive relief.

## II. DISCUSSION

We agree with the district court's conclusions concerning both of this case's salient issues. Our review of the record convinces us that MC failed to establish the irreparable injury required to necessitate injunctive relief. Moreover, we agree that no fundamental public policy of Minnesota overrides the choice of law provision agreed upon by the parties in the distributorship agreement.

### A. No Irreparable Injury

■ The burden of proving that a preliminary injunction[5] should be issued rests entirely with the movant. *See Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987); *Jensen v. Dole*, 677 F.2d 678, 680 (8th Cir.1982). Unless the district court's denial of injunctive relief is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise, we may not reverse on appeal. *See, e.g., Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.*, 815 F.2d 500, 503 (8th Cir.1987); *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir.1981).

■ In 1981, this court convened en banc to "clarify the standard to be applied by the district courts in this circuit in considering requests for preliminary injunctive relief." *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 112 (1981) (en banc). The *Dataphase* court emphasized that when deciding whether to issue a preliminary injunction, a district court must consider four relevant factors: the threat of irreparable harm to the movant, the balance between such irreparable harm and

---

3. MC then removed the case to federal court.

4. Federal diversity jurisdiction in this case is pursuant to 28 U.S.C. §§ 1331 and 1337.

5. When this court evaluates a motion for preliminary injunctive relief, we do so in accordance with Rule 65 of the Federal Rules of Civil Procedure and relevant federal case law. In diversity jurisdiction cases, we apply federal instead of state law because the United States

Supreme Court has held that federal law governs all procedural issues in federal courts, regardless of the basis of jurisdiction. Therefore, an applicable Federal Rule of Civil Procedure (in this case, Fed.R.Civ.P. 65) must be used instead of a corresponding state rule of procedure when a conflict arises between them. *See Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965); *Hughes v. Mayo Clinic*, 834 F.2d 713, 717 (8th Cir.1987).

the corresponding harm that injunctive relief would inflict on other interested parties, the movant's prospects for success on the merits, and the public interest. *Id.* at 113. The court then stated that "[i]n balancing the equities[,] no single factor is determinative." *Id.* However, one moving for a preliminary injunction is required to show the threat of irreparable harm. In fact, absence of a finding of irreparable injury is sufficient grounds for vacating a preliminary injunction. *Id.* at 114.

The district court did not err in denying preliminary injunctive relief in this case because MB's actions caused no irreparable injury to MC. The district court did not abuse its discretion or rely on an erroneous legal premise when it concluded that MC would not sustain irreparable harm if MB terminated the distributorship agreement and entered into direct competition with MC for the patronage of customers in Minnesota and North Dakota. As the court emphasized, MC is free to purchase hardware directly from Texas Instruments. In addition, nothing prevents MC from purchasing its software requirements from another company. Moreover, even if MC loses the eighty-six clients to whom it has sold MB systems, it will still have a customer base in excess of 310. The record contains abundant indications that MC's dealings with MB have dwindled significantly in the last two years and that MC has other significant avenues of business (encompassing both sales and maintenance) despite the deterioration of the relationship with MB.

Finally, MC will not be irreparably harmed by the denial of its motion because with or without injunctive relief, it will have an adequate remedy at law if it succeeds in establishing the merits of its substantive allegations of antitrust violation (with its concomitant treble damages for victors), wrongful termination, defamation, breach of contract, et cetera.

Finding no proof of irreparable injury, we conclude our *Dataphase* analysis, convinced that the decision of the district court not to grant injunctive relief was not an abuse of discretion.

## B. Choice of Law

Even if we assume, *arguendo*, that MC has proved the threshold issue of irreparable harm and that MC then proceeded to construct a cogent argument under the remainder of the *Dataphase* analysis, we would nevertheless affirm the district court's denial of injunctive relief pursuant to the Minnesota Franchise Act. We are convinced that the choice of law clause in the MC–MB distributorship agreement precludes the application of Minnesota law to this dispute.

MC argues that by inserting an anti-waiver clause in its Franchise Act, Minnesota expressed a fundamental public policy opposing waiver via party agreement. This policy, the argument continues, overrides the choice of law clause in the distributorship agreement. We believe that this argument underestimates both the applicability of *Tele–Save Merchandising Co. v. Consumers Distributing Co.*, 814 F.2d 1120 (6th Cir.1987), to this case and the bargaining power MC possessed when it signed the distributorship agreement. Therefore, we agree once more with the conclusions of the district court.

In *Tele–Save*, the Sixth Circuit upheld a choice of law provision in a supply agreement despite the existence of an Ohio statute that (like the Minnesota Franchise Act) includes a non-waiver provision. The court chose to enforce the choice of law provision for the following reasons: (1) the parties had agreed in advance to the law to be applied in future disputes; (2) contacts between the parties were fairly evenly divided between the state selected in the contract and the plaintiff's home state; (3) the parties were not of unequal bargaining strength; and (4) the application of the law chosen in the contract was not repugnant to the public policy of the plaintiff's state. *Id.* at 1123.

An analysis like that employed in *Tele–Save* reveals that the same result must be reached in this case.

MC's arguments concerning the choice of law issue contain two fundamental misunderstandings. First, as we will examine later, MC is incorrect in its assumption that

Minnesota clearly has the stronger state interest in this case. Second, we do not agree that a fundamental public policy of Minnesota (protection of in-state companies by the Minnesota Franchise Act) overrides the choice of the parties in light of the reasoning in *Tele–Save.*

The Minnesota Franchise Act was adopted sixteen years ago. It protects franchisees in Minnesota from unreasonable or abusive treatment by powerful franchisors. *See Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn.1982); *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn.1978). To qualify for the Act's protection, a Minnesota franchisee must: (1) have a right to use the franchisor's trade name or commercial symbol; (2) share a community of interests with the franchisor in the marketing of goods or services; and (3) be required to pay a franchise fee. Minn.Stat. 80C.01(4). *See generally RJM Sales and Marketing, Inc. v. Banfi Products Corp.*, 546 F.Supp. 1368, 1373 (D.Minn.1982); *Chase Manhattan Bank v. Clusiau Sales and Rental, Inc.*, 308 N.W.2d 490, 492 (Minn.1981).

The Act imposes a number of procedural requirements, demands factual disclosures by would-be franchisors, and regulates termination of franchises. The sole remedy offered by the Act for unfair or inequitable termination of franchises is injunctive relief. *See* Minn.Stat. 80C.02, .04, .06, .14(1), .14(3); *Mason v. Farmers Insurance Cos.*, 281 N.W.2d 344, 348 (Minn. 1979).

The anti-waiver provision, § 80C.21, reads as follows:

> Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

Having briefly set out the essential content of the Act, we now proceed to apply the analysis developed in *Tele–Save.*

Neither party denies that the distributorship agreement established the law to be used in future disputes. Paragraph 16 of the agreement plainly states that "[t]he parties agree that this agreement shall be governed by the laws of Nebraska."

As for the division of contacts between the parties and the two potential forum states, we believe they are fairly evenly divided between Nebraska and Minnesota. Nebraska is MB's state of incorporation and principal place of business, the site of the negotiation and signing of the MC–MB agreement, and the state named in the choice of law clause. Minnesota is the place of performance of the contract, MC's place of incorporation, and the home of a great deal of MC's clientele. We conclude that this "fairly even division" satisfies the requirement in *Tele–Save.*

Next, we must consider the parties' relative levels of bargaining power. In an earlier incarnation of this case, the Minnesota district court, *see supra* pp. 736–737, specifically found that at the time of their agreement, MC and MB were *not* of unequal bargaining power. *Modern Computer Systems v. Modern Banking Systems*, No. 104618, slip op., Dakota County, Minnesota, October 19, 1987 (unpublished memorandum opinion). The court concluded that "[t]he contract is not adhesive. There is no evidence of a great disparity in bargaining power between the parties * * *." *Id.*

Although we recognize that the literature of franchising law is strewn with reports of sophisticated and financially powerful franchisors taking advantage of relatively inexperienced franchisees, we do not believe that the facts in this case fit that stereotype. This matter involves multi-million-dollar dealings between two computer companies with nationwide clienteles. To give MC the benefit of protection under the Minnesota Franchising Act after they knowingly waived it (without attempting to negotiate for more favorable choice of law terms) would be unduly paternalistic. Some evidence of oppressive, unreasonable or unfair use of superior bargaining position, as in a contract of adhesion, is required before a court can justifiably disregard a mutually agreed upon choice of law clause. No such extreme circumstances exist in this case. Accordingly, we see

nothing that persuades us that MC's and MB's levels of bargaining power were widely disparate at the time of their agreement.

Last, we are unpersuaded by MC's argument that a fundamental public policy of Minnesota overrides the choice of law clause and requires application of Minnesota law. The Minnesota Franchise Act undeniably does evince a policy in favor of offering franchisees in Minnesota remedies greater than those available under traditional common law, but we also see a powerful countervailing policy: Minnesota's traditional willingness to enforce parties' choice of law agreements: *see Milliken and Co. v. Eagle Packaging Co.*, 295 N.W. 2d 377 (1980) (when parties agree that the law of another state shall govern their agreement, Minnesota courts will interpret and apply the law of the state where such an agreement is made); *Combined Insurance Co. of America v. Bode*, 247 Minn. 458, 77 N.W.2d 533 (1956) (parties to a contract acting in good faith and without an intent to evade the law may agree that the law of the state in which the contract is made shall govern its interpretation).

## III.  CONCLUSION

The district court did not abuse its discretion or rely on an erroneous legal premise when it concluded that MC sustained no irreparable harm resulting from MB's actions and that the parties' choice of law clause was enforceable. Therefore, the court's denial of MC's motion for preliminary injunctive relief pursuant to the Minnesota Franchise Act is affirmed.

HEANEY, Senior Circuit Judge, with whom LAY, Chief Judge, joins, dissenting.

I respectfully dissent. The majority opinion allows foreign franchisors to avoid the applicability of the Minnesota Franchise Act. I believe enforcing the choice of law provision nullifies Modern Computer's statutory rights under this Act, violating a clearly articulated public policy of the State of Minnesota.

I.  Enforceability of the Choice of Law Provision

The majority determines that Minnesota law does not apply to this dispute. In deciding whether Nebraska or Minnesota governs this action, a federal district court sitting in Nebraska must follow Nebraska's conflict of laws rules. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Birdsell v. Holiday Inns*, 852 F.2d 1078, 1079 (8th Cir.1988). The district court determined that Nebraska follows the Restatement (Second) of Conflicts of Law, and noted that Nebraska courts have honored choice of law provisions in past cases. *See Shull v. Dain, Kalman & Quail, Inc.*, 201 Neb. 260, 267 N.W.2d 517, 520 (1978); *Exchange Bank & Trust Co. v. Tamerius*, 200 Neb. 807, 265 N.W.2d 847, 850 (1978).

The choice of law provision in the distributor agreement provides that it "shall be governed by the laws of the State of Nebraska." This provision implicates section 187 of the Restatement which provides:

**Laws of the State Chosen by the Parties**

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law

in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Restatement (Second) of Conflict of Laws § 187 (1971).

The first step is to determine whether the contested issue is one which could have been resolved by a contractual provision. *See Sheldon v. Munford, Inc.*, 660 F.Supp. 130, 137 (N.D.Ind.1987) (court enforced choice of law provision in franchise agreement because parties could have included, and did include provision as to the contested grant of exclusive territory in the agreement). Comment c to section 187(1) indicates that if the dispute centers on rules relating to construction, to conditions precedent and subsequent, to sufficiency of performance or to excuse for nonperformance, the forum should apply the provisions of the chosen law. Comment d to section 187(2) cites examples of questions which typically cannot be determined by explicit agreement: capacity, formalities, substantial validity, or illegality. The issue in this case is more than a dispute over contract interpretation; rather, the parties essentially dispute the legality of the choice-of-law provision itself. I do not see how either party could have avoided this issue by stating in the contract that the provision does not violate Minnesota public policy.

The next step is to determine whether under section 187(2)(b), Minnesota has a materially greater interest than Nebraska in the outcome of this issue, and whether Minnesota would be the state of the applicable law if no choice of law provision had been made. Comment g reflects the rationale for this: "Fulfillment of the parties'

expectations is not the only value in contract law; regard must also be had for state interests and state regulation."

There is no question that Minnesota has a greater interest in the issue of whether its public policy would void the choice of law provision. I think it equally clear that Minnesota has the most significant relationship to the transaction.[1]

First, Nebraska has declined to take any interest in regulating franchises outside of Nebraska. Although Nebraska has a franchise statute similar to that of Minnesota, *see*, Neb.Rev.Stat. § 87–401 *et seq.*, section 87–403(1) provides that the Nebraska act only applies "to a franchise the performance of which contemplates or requires the franchise to establish or maintain a place of business within the State of Nebraska * * *." Minnesota, on the other hand, has a significant interest in regulating the agreement between Modern Computers and Modern Banking and has attempted to do so by enacting the Minnesota Franchise Act. *See Barnes Group, Inc. v. C & C Products, Inc.*, 716 F.2d 1023, 1030 (4th Cir.1983) (per curiam) (Alabama's interest in regulating business relationships within the state is materially greater than Ohio's generalized interest in protecting the interstate contracts of its domiciliary).

Second, Minnesota has more material "contacts" with this transaction. Nebraska's primary contact is that Modern Banking has its place of business there and the distributor agreement was signed there. Minnesota, however, is the place of performance of the contract, as well as the place of incorporation of Modern Computers. Modern Banking delivers its product to Minnesota and enters into contractual arrangements in Minnesota with Minnesota

---

**1.** Section 188 of the Restatement provides that, in the absence of an effective choice of law by the parties, the governing law will be that of the state which has the most significant relationship to the transaction, considering (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of parties. Restatement (Second) Conflicts of Laws § 188(2). Section 188 of the Restatement

must be read in conjunction with the principles contained in section 6 of the Restatement, which include any statutory directives on choice of law in the forum state; the needs of the interstate and international systems; relevant policies of the forum; relevant policies of other interested states and their interest in resolution of the dispute; protection of justified expectations; basic policies underlying the particular field of law; certainty, predictability and uniformity of result; and ease in the determination and application of the law to be applied.

customers for use of its software packages. Clearly, Minnesota would be the state of the applicable law if no choice of law provision existed.

The final step under section 187 is to determine whether application of Nebraska law violates a fundamental policy of Minnesota. Specifically, may we enforce this provision when to do so eliminates the statutory remedies provided to Modern Computers by the Minnesota Franchise Act? Contrary to the views of the majority, Modern Computers does not seek to invalidate the choice of law provision because the distributor agreement is an adhesion contract. Nor does it wish to invalidate the provision because Modern Banking has superior bargaining power which it took advantage of during negotiations. Rather, Modern Computer seeks to invalidate the choice of law provision because it limits its rights and remedies as a franchisee against a franchisor. Thus, the focus should be whether Modern Computer's rights and remedies have been limited, and if so, whether such a limitation violates Minnesota public policy.

First, Minn.Stat. § 80C.21 provides: "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is *void. See also* Minn.Rules pt. 2860.4400 subpt. D (1987) (prohibits any franchisor from requiring a franchisee to agree to any term in a contract which relieves any person from liability imposed by the Act).[2]

Second, Nebraska's Franchise Practices Act only extends to franchisees *within* the State of Nebraska. Thus, application of Nebraska law will leave Modern Computers without the remedies available under either state franchise act. Such an outcome negates the decision of the legislature to offer franchisees in Minnesota more protection than the traditional common law remedies, which had proven ineffective in regulating abuses in the franchise industry. *See* Note, *Regulation of Franchising*, 59 Minn.L.Rev. 1027, 1028–36 (1975).[3]

Third, any attempt to narrow the applicability of the Minnesota Franchise Act has been found to violate public policy. In *Chase Manhattan Bank, N.A. v. Clusiau Sales*, 308 N.W.2d 490 (Minn.1981), the Supreme Court of Minnesota held that a franchise agreement provision in which a franchisee waived all defenses against a franchisor narrowed the remedial reach of the Minnesota Franchise Act, thereby violating state public policy. It wrote: "As the trial court pointed out, enforcement of waiver of defense provision against Minnesota residents who have entered franchise agreements with franchisors who failed to comply with the franchise statute would adversely affect the remedial reach of that statute. * * * We hold the [waiver of defense] provisions contrary to public policy * * *." 308 N.W.2d at 494.

The choice of law provision in the present case similarly affects the remedial reach of the Minnesota Franchise Act. It becomes in effect a waiver of all rights statutorily afforded to Modern Computers, a waiver rendered void by Minn.Stat. § 80C.21.

---

**2.** Neb.Rev.Stat. § 87–406(1) contains an anti-waiver provision similar to that found in section 80C.21. It provides:

It shall be a violation of sections 87–401 to 87–410 for any franchisor, directly or indirectly, through any officer, agent or employee, to engage in any of the following practices:

(1) To require a franchisee at the time of entering into a franchise arrangement to assent to a release, assignment, novation, waiver or estoppel which would relieve any person from liability imposed by sections 87–401 to 87–410; * * *.

Neb.Rev.Stat § 87–406(1) (1977).

**3.** In *Jurisdiction, Choice of Law and Choice of Venue in the Wake of Burger King Corp. v. Rudzewicz*, 3 Franchise Legal Digest 19 (1987),

one commentator agreed with the interpretation advanced by the Minnesota Attorney General:

State franchise disclosure and franchise relationship/termination statutes, however, frequently contain provisions that *directly or indirectly make choice of law provisions inapplicable if their effect would be to deprive a resident franchisee of the protections of the state's laws.* * * * Such statutes purport to express a rule of substantive law, and for that reason, state choice of law rules (such as those contained in the Restatement) do not come into play. *The statute renders void the party's choice of law as a matter of substantive law.*

*Id.* at 26, *citing* Minn.Stat. § 80C.21 (footnotes omitted, emphasis added).

Finally, the majority relies heavily on *Tele–Save Merchandising v. Consumers Distributing*, 814 F.2d 1120 (6th Cir.1987) to find that the choice of law provision in this case violates no "fundamental" state policy. In my view, *Tele–Save* is based on faulty reasoning. To determine whether a choice of law provision rendering the Ohio Business Opportunity Act inapplicable violated a fundamental public policy of Ohio, the Sixth Circuit focused on the number of contacts each party had with the two states and the absence of unequal bargaining strength between the parties. This analysis, however, misses the mark. The key to determining whether a statute embodies a fundamental public policy is whether the state legislature enacted a statute to protect persons from the oppressive use of superior bargaining power, *not* whether this power is used in a particular case. Furthermore, the number of contacts a transaction has with a state sheds absolutely no light on the public policy issue.[4]

It is clear that, without an affirmative statement by a state legislature, there can be no clear-cut delineation of those policies that are sufficiently "fundamental" within the meaning of section 187(2)(b) of the Restatement to warrant overriding a contractual stipulation of controlling law.[5] Yet, a well reasoned approach to this issue can be found in *Barnes Group, Inc. v. C & C Products, Inc., supra.* In *Barnes*, the Fourth Circuit refused to enforce a choice of law clause in an employment contract because a restrictive covenant in the contract violated a fundamental public policy of one employee's home state. It stated "it seems apparent that where the law chosen by the parties would make enforceable a contract flatly unenforceable in the state whose law would otherwise apply, to honor the choice-of-law provision would trench

upon that state's 'fundamental policy.' " 716 F.2d at 1031. Thus, if a state has rendered certain transactions void by statute, that act is sufficient to demonstrate a fundamental public policy. In this case, the Minnesota Legislature prohibits *any* transaction intended to narrow or eliminate the applicability of the Minnesota Franchise Act. Thus, the choice of law provision itself, not merely its application in this case, violates the Act and violates a fundamental public policy.

The majority makes much of the fact that there was no disparity of bargaining power between the parties in this case. The Minnesota Legislature, however, did not exempt from the scope of the franchise act those franchisors who have equal bargaining power with their franchisees. The presumption on the part of the Legislature is that *all* franchise transactions must be regulated to avoid unfair trade practices. The Legislature has decided that all such agreements are subject to state regulation, not just those found unfair after the fact.

I believe that the language of the Minnesota Franchise Act clearly shows that franchise agreements entered into with Minnesota residents must comply with the Act's requirements and any attempt to circumvent this law violates a fundamental public policy. *See also Winer Motors, Inc. v. Jaguar Rover Triumph, Inc.*, 208 N.J.Super. 666, 506 A.2d 817, CCH Bus.Fran. Guide ¶ 8576 (1986) (court will disregard choice of law in franchise agreement in order to preserve the fundamental public policy of the franchisee's home state where its statutes afford greater protection).

## II. Irreparable Injury

Only after the Court determines what substantive law applies can it correctly as-

---

**4.** As the dissent in *Tele–Save* pointed out:

The majority suggests that whether a state's policy is fundamental depends on the number of contacts the state has with the transaction. To the contrary, Restatement (Second) Conflicts of Laws § 187 Comment g (1971), provides only "that the more contacts the transaction has with the chosen state, the stronger the public policy must be to overcome the stipulation." E. Scoles & P. Hay, Conflict of Laws § 18.9, at 648 (1984).

814 F.2d at 1125 n. 1 (Milburn, J., dissenting).

**5.** There exists no clear statement from the Minnesota Legislature indicating how "fundamental" the public policy set forth in the Minnesota Franchise Act is. As the majority's decision is merely a matter of statutory interpretation, it would be subject to reversal if the state legislature were to clearly indicate that the Minnesota Franchise Act overrides choice of law clauses if they operate as waivers under Minn.Stat. § 80C.21.

sess whether a party will be irreparably harmed if no injunction issues. *See Rittmiller v. Blex Oil, Inc.*, 624 F.2d 857, 860–62 (8th Cir.1980) (Court examined issue of irreparable injury under each legal claim). I recognize that this Court in *Rittmiller* and many other Circuits have limited the situations in which a distributor can be awarded a preliminary injunction.[6] *See Rittmiller*, 624 F.2d at 861–62 (antitrust damages an available remedy at law); *Jackson Kahn Music Co., Inc. v. Baldwin Piano & Organ*, 604 F.2d 755, 763 (2d Cir.1979) (plaintiff failed to show that loss of franchisor's products would result in lost customers or that sale of franchisor's products constituted cornerstone of plaintiff's marketing efforts).

We must remember, however, that state franchise acts were enacted because of the inadequacy of the common law and antitrust remedies for franchisees. *See* 59 Minn.L.Rev. at 1028–36 (common law actions for fraud, for violations of securities act, and for antitrust violations have all proven ineffective in dealing with problems encountered in the franchise relationship). Minnesota's Legislature enacted chapter 80C in 1973 as remedial legislation to protect franchisees within Minnesota from unfair contracts and other previously unregulated abuses in a growing national franchise industry. *Clapp v. Peterson*, 327 N.W.2d 585, 586 (Minn.1982); *Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn.1978). Nebraska's Franchise Practices Act also acknowledges that the regulation of distribution and sales through franchise arrangements was necessary to protect the general economy of the state, the public interest and the public welfare. Neb.Stat. § 87–401. *See also McArtor v. Mobil Oil Corp.*, 212 Neb. 592, 324 N.W.2d 399, 400 (1982) (prior to enactment of Nebraska Franchise Practices Act, franchisors could terminate franchises for any reason). By refusing to nullify Mod-

ern Banking's choice of law clause, the majority removes any adequate remedy available to Modern Computers as neither Minnesota's nor Nebraska's franchise act applies to this case. The lack of an *adequate* remedy provides a basis for granting injunctive relief.

Furthermore, a substantial portion of Modern Computers business is derived from its relationship with Modern Banking. Approximately 72.5% of Modern Computer's business involves the sale and maintenance of Modern Banking's software, the sale and maintenance of hardware, and the sale of supplies to banking customers using Modern Banking's data processing system. While Modern Computers would not be precluded from performing some of these services, it would lose a very significant percentage of its business and an immeasurable amount of goodwill. *See John B. Hull, Inc. v. Waterbury Petroleum*, 588 F.2d 24, 29 (2d Cir.1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979) (preliminary injunction properly issued when injury to goodwill and reputation would force plaintiff out of business); *Al Bishop Agency, Inc. v. Lithonia–Division of National Service Industries, Inc.*, 474 F.Supp. 828, 835 (E.D.Wis.1979) (potential loss of 60% of plaintiff's business justified preliminary relief preventing dealership termination); *Paul Reilly Co. v. Dynaforce Corp.*, 449 F.Supp. 1033, 1035 (E.D.Wis.1978) (potential loss of goodwill and confusion in marketplace constitute irreparable injury if dealership terminated); *Brennan Petroleum Products Co. v. Pasco Petroleum Co.*, 373 F.Supp. 1312, 1316–17 (D.Ariz.1974) (potential loss of goodwill and ability to compete effectively in marketplace justified preliminary relief).

If the Minnesota Franchise Act applies, as I believe it must, injunctive relief is Modern Computer's sole remedy for Modern Banking's alleged unfair trade practices. *See* Minn.Stat. § 80C.14(1) (Supp.1987) (a violation is enjoinable by a court of com-

---

**6.** Preliminary injunctions, however, are considered extremely important in franchise termination suits. "When a distributor decides to seek injunctive relief against termination, the preliminary injunction is all important. If the dealer loses that motion * * * the status quo

prior to litigation will not be preserved and a future permanent injunction is meaningless and inappropriate." Faruki, *The Defense of Terminated Dealer Litigation: A Survey of Legal and Strategic Considerations*, 46 Ohio L.Rev. 925, 993 (1985).

petent jurisdiction). The civil liabilities section of the Act, Minn.Stat. § 80C.17, which provides for damages, excludes section 80C.14, the section outlining the notice, cure and good cause requirements for termination. *See also Mason v. Farmers Ins. Co.*, 281 N.W.2d 344, 348 (Minn.1979) (injunctive relief is the only available remedy for violation of Minn.Stat. § 80C.14). By making injunctive relief the sole remedy, the Minnesota Legislature appears to have expressed a policy that the inadequacy of the remedy at law is statutorily presumed when there is a termination without good cause or proper notice.

Because I believe the choice of law provision in the distributor agreement violates a fundamental public policy of Minnesota, I would refuse to enforce it in this case. As I feel that Modern Computers has no adequate remedy under either Nebraska or Minnesota law, I would reverse the judgment of the district court denying Modern Computer's request for preliminary relief.