Virginia M. BINGER, Plaintiff,

v.

H.M.A. INVESTMENTS, INC., a
Delaware Corporation, and Howard
M. Appel, Defendants.

Civ. No. 4–94–467.

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 27, 1995.

J.D. Jackson, Elizabeth S. Wright, Dorsey & Whitney, Minneapolis, MN, for plaintiff.

Frank Allen Dvorak, Foley & Mansfield, Minneapolis, MN, Karl Heinzerling, Daniel J. Dugan, Shona K. Gibson, Spector Gadon & Rosen, Philadelphia, PA, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of plaintiff Virginia M. Binger for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated below, the court grants plaintiff's motion.

## BACKGROUND

This is an action to enforce a $1,350,000 promissory note (the "Binger Note") made by defendant H.M.A. Investments, Inc. ("H.M.A."), personally guaranteed by defendant Howard M. Appel ("Mr. Appel"), and made payable to plaintiff Virginia M. Binger ("Mrs. Binger"). The dispute between the parties arises from a series of transactions between them in Minnesota, Pennsylvania,

and Texas. Although the facts of this case are complicated, the legal issues are simple.

In May 1990, Mr. Appel telephoned Russell Felten ("Mr. Felten"), Mrs. Binger's financial advisor from September 1988 through May 1993, to propose a loan transaction. Mr. Appel proposed that Mrs. Binger lend $1,350,000 to H.M.A., which in turn would lend this amount to DH Partners L.P. ("DH Partners"). DH Partners is a limited partnership controlled by Mr. Appel and Mr. Donald Bailey, a business associate of Mr. Appel. DH Partners in turn would use the money to purchase stock in Diversified Human Resources Group ("DHRG"), a Texas corporation.

Mr. Appel met with Mr. James Binger ("Mr. Binger"), Mrs. Binger's husband, Mr. Felten and representatives of First Trust in Minneapolis to negotiate the proposed loan.[1] After the parties established the terms of the transaction, Steve Cohen, Mr. Appel's lawyer, drafted the Binger Note. On June 23, 1990, Mr. Appel signed the Binger Note on behalf of H.M.A. and as a personal guarantor.

The terms of the Binger Note are not disputed. Under the Binger Note H.M.A. promised to do the following:

(1) repay the principal sum of $1,350,00 on July 1, 1991;

(2) pay interest to Mrs. Binger on the first day of each month in arrears on the outstanding principal balance[2];

(3) pay Mrs. Binger an initial $50,000 origination fee and an additional $50,000 origination fee if DH Partners applied more than $475,000 of the loan proceeds to the purchase of DHRG stock;

(4) initially deliver 25,000 shares of DHRG stock to Mrs. Binger, and thereafter for each quarter that funds remained due and owing on the Binger Note after the 91st day of its execution, H.M.A. was to deliver to Mrs. Binger either 25,000 shares of DHRG stock if the entire principal amount remained outstanding or, if less than the entire principal amount remained outstanding, a pro-rata amount of the 25,000 shares.

Mrs. Binger did loan $1,350,000 to H.M.A. As security for repayment of the Binger Note, H.M.A. pledged all of the DHRG shares it acquired to Mrs. Binger. As additional security, Mr. Appel personally guaranteed H.M.A.'s obligations under the Binger Note. Finally, the Binger Note contains an attorneys' fee provision that states that if the Binger Note was placed in the hands of an attorney for collection, Mrs. Binger would be entitled to receive attorneys' fees equal to five percent of the unpaid principal balance and all costs of the suit.

Defendants do not contest these facts. They claim, however, that the amounts due under the Binger Note have been reduced, in whole or in part, by two transactions: (1) a note assignment, and (2) a stock transfer agreement.

### 1. The Note Assignment

Initially, H.M.A. made interest payments and occasionally made principal payments to Mrs. Binger. Defendants, through DH Partners, also applied more than $475,000 to the purchase of DHRG stock. DH Partners, however, were unable to acquire all of the outstanding shares of DHRG stock. As a result, in approximately April 1991, DH Partners decided to abandon its stock acquisition plan and attempted to sell the 255,700 DHRG shares it had acquired. Mr. Bailey, acting for DH Partners, found a buyer. That buyer was USFG–DRHG # 1, Ltd., a Texas limited partnership whose limited partners included Donald R. Ditto, Sr. and members of his family (the "Ditto Group"). On April 22, 1991, USFG–DHRG # 1 entered into a stock purchase agreement with DH Partners in which USFG–DHRG # 1 agreed to purchase all of DH Partners' 255,700 DHRG shares for $409,120. In return, USFG–DHRG # 1 gave

---

1. Mrs. Binger never had any direct contact with the defendants regarding any of the transactions at issue in this case. Mr. Binger and Mr. Felten, as Mrs. Binger's agents, negotiated and executed all of the relevant documents including the Note Assignment and Stock Transfer Agreement.

2. The Binger Note specified that interest was to be paid at the prime rate. Later, the parties modified that provision and agreed to a 10 percent interest rate.

DH Partners a promissory note for $409,120 (the "Ditto Note"), due January 11, 1992.

DH Partners assigned the Ditto Note to Mrs. Binger through a written Note Assignment dated June 7, 1991. Because the DHRG shares acquired by DH Partners had been pledged to Mrs. Binger and were being held in escrow, DH Partners needed Mrs. Binger's consent to release the stock from escrow. Accordingly, the Note Assignment provided that Mrs. Binger would direct the escrow agent to release the 255,700 DHRG shares, but only upon full payment of the Ditto Note on or before its due date.[3]

By June 30, 1991, USFG–DHRG # 1 had apparently defaulted on the interest payments due on the Ditto Note. Accordingly, DH Partners, through Mr. Bailey, and USFG–DHRG # 1 entered into a Modification Agreement. The Modification Agreement did not change the terms of the Ditto Note regarding repayment of principal, but only changed the terms regarding the repayment of interest.

DH Partners and USFG–DHRG # 1 amended the Ditto Note at least two more times. Neither Mrs. Binger nor her representatives, Mr. Binger or Mr. Felten, negotiated, reviewed, approved or executed either the Modification Agreement or the two subsequent modifications.

Although USFG–DHRG # 1 made some payments to Mrs. Binger, by January 11, 1992, it had defaulted on the Ditto Note. Mr. Bailey, again acting for DH Partners, entered into several transactions through which liability for the remaining amount due under the Ditto Note was transferred to USFG–DHRG # 2, Ltd., another Texas limited partnership. On March 31, 1993, USFG–DHRG # 2 gave two promissory notes payable to DH Partners in amounts totaling $352,140 ("Replacement Notes"). The Re-

placement Notes were, in effect, substituted for the Ditto Note.

Mrs. Binger was not designated as payee under the Replacement Notes, and DH Partners did not assign their rights under the Replacement Notes to Mrs. Binger. The principal amounts under the Replacement Notes were due in August and September, 1994. USFG–DHRG # 2 is currently in default on the Replacement Notes.

## 2. The Stock Transfer Agreement

Around March 1993, Mr. Appel proposed that he and H.M.A. could satisfy a portion of the amount due under the Binger Note by transferring 48,500 restricted shares of stock in North American Environmental Group, Inc. ("NAE") owned by H.M.A. to Mrs. Binger.[4] Mr. Appel had his attorneys draft the proposed agreement ("Stock Transfer Agreement"). The Stock Transfer Agreement was signed by Mr. Appel and Mr. Felten on March 15, 1993. The Stock Transfer Agreement provided that H.M.A. would transfer 48,500 shares of NAE stock to Mrs. Binger who would in return reduce the principal balance of the Binger Note by $445,000 and cover accrued interest up to March 1, 1993.[5] Through the Stock Transfer Agreement, the parties agreed that after the stock transfer the principal balance due under the Binger Note would be $380,000.

Mrs. Binger did not receive any payments on the amounts owed by H.M.A. and Mr. Appel under the Binger Note after August 1993. Subsequently, on December 9, 1993, almost nine months after the Stock Transfer Agreement had been signed, Mr. Felten wrote to Mr. Appel and rescinded the Stock Transfer Agreement because neither H.M.A. nor Mr. Appel had transferred the NAE stock to Mrs. Binger.

---

3. The face value of the Ditto Note given to finance the purchase of 255,700 shares of DHRG Stock was $409,120. It is undisputed that Mrs. Binger has not received this amount in full payment of the Ditto Note.

4. Mr. Appel also informed Mr. Felten that his attorneys were preparing a registration statement to be filed with the Securities and Ex-

change Commission that would enable NAE shares to be exchanged on a one-for-one basis for shares of NAE's corporate parent, North American Technologies Group, Inc. ("NATK").

5. As of March 1, 1993, the outstanding principal balance was $825,000 and the accrued interest on the note was $21,485.90.

## DISCUSSION

■ The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgement as matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

■ On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather, the nonmoving party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). If reasonable minds could differ as to the import of the evidence, however, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. With these standards in mind, the court will consider the plaintiff's motion.

Mrs. Binger does not dispute that the defendants have made some payments of principal and interest on the Binger Note, and she has reduced the amount due under Binger Note accordingly. She also does not dispute that defendants have made some payments on the assigned Ditto Note, and she has reduced the amount due under the Binger Note accordingly. Mrs. Binger argues, however, that the Note Assignment did not reduce the defendants' obligations under the Binger Note beyond the payments that she received under the Ditto Note. Additionally, Mrs. Binger argues that the Stock Transfer Agreement did not reduce the defendants' obligations under the Binger Note because the NAE stock was never transferred to her and she therefore rescinded the agreement. Accordingly, Mrs. Binger argues that she is entitled to summary judgment because she has shown that she loaned $1,350,000 to H.M.A., that in return H.M.A. executed a valid and binding promissory note which Mr. Appel personally guaranteed, and that H.M.A. and Mr. Appel have breached their obligations under the Binger Note by failing to repay the entire principal and interest due by July 1, 1991.

Defendants do not dispute that H.M.A. executed the Binger Note, nor do they dispute the terms of that note. They also do not dispute that they have not repaid the entire principal and interest due under the Binger Note by payment of cash or cash equivalent. They argue, however, that the March 15, 1993, Stock Transfer Agreement made the Binger Note irrelevant because their performance under the Stock Transfer Agreement reduced the balance of the Binger Note to $380,000. Moreover, defendants argue that any obligation on the Binger Note remaining after they completed their performance under the Stock Transfer Agreement was eliminated altogether by the Note Assignment. Accordingly, defendants claim that whether summary judgment is appropriate turns on the parties' performance under the Stock Transfer Agreement.

■ Both the Note Assignment and the Stock Purchase Agreement state that they shall be construed, interpreted, and enforced "in accordance with the laws of the Commonwealth of Pennsylvania." The parties have briefed the case under Pennsylvania law, which the court thus applies. *See Modern Computer Sys. v. Modern Banking Sys.,* 871 F.2d 734, 740 (8th Cir.1989) (citing *Milliken and Co. v. Eagle Packaging Code,* 295

N.W.2d 377 (Minn.1980)). Under Pennsylvania law, when interpreting a contract, a court must determine the intent of the contracting parties as objectively manifested by them, and effect must be given to all provisions of the contract. *Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 837 (3d Cir.1995); *Hullett v. Towers, Perrin, Forster & Crosby, Inc.,* 38 F.3d 107, 111 (3d Cir. 1994). If a contract is clear or unambiguous, then the court construes the contract as a matter of law by its contents alone. *Allegheny Int'l v. Allegheny Ludlum Steel Corp.,* 40 F.3d 1416, 1424 (3d Cir.1994).[6] " 'A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.' " *Id.* (citations omitted). The interpretation of an ambiguous contract is left to the factfinder to resolve the ambiguity in light of extrinsic evidence. *Hullett,* 38 F.3d at 111. Accordingly, the court's interpretation of the Note Assignment and Stock Transfer Agreement is guided by these principles.

**a. Note Assignment**

 The court begins its analysis by examining the language of the Note Assignment, which states in the relevant parts:

Whereas D & H is desirous of assigning to [Mrs. Binger] all of its right title and interest in and to the Ditto Note....

. . . . .

1) Assignment. D & H hereby assigns conveys and transfers to [Mrs. Binger] all of its rights, title, and interest in and to the Stock Sale Agreement, including the Ditto Promissory Note issued by Ditto thereunder. [Mrs. Binger] hereby accepts the assignment of D & H's rights, title and interest in said Stock Sale Agreement, including but not limited to the Ditto Promissory Note.

. . . . .

(3) ... [Mrs. Binger] hereby directs Escrow Agent to release to Ditto the 255,700 DHRG Shares upon receipt by [her] of full payment of the Ditto Note on or before [January 11, 1992].

The court finds that the language of the Note Assignment is clear and unambiguous. The contract states that the assignment was made "in consideration of the mutual covenants contained herein and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged...." The Note Assignment's only covenant required Mrs. Binger to release the DHRG shares pledged to her and held in escrow upon her receipt of full payment of the Ditto Note.

There is no language in the Note Assignment which indicates that the parties intended that the assignment of the Ditto Note, without more, would satisfy any part of the defendants' underlying obligations on the Binger Note. Moreover, there is no other document in the record reflecting such an agreement. Nonetheless, defendants claim that there is a factual dispute concerning whether Mrs. Binger accepted the Ditto and Replacement Notes as substitutes for the defendants' performance under the Binger Note. Defendants base this argument on paragraphs 5 and 6 of Mr. Appel's affidavit. These two paragraphs state that "... the rights and liabilities of the DHRG stock changed between different entities ...," and "[t]he assignment of various notes ... were all done with the knowledge and consent of Virginia Binger and/or her agent Russell Felten."

Even assuming Mrs. Binger knew of and consented to what the defendants had done, Mr. Appel's statements do not establish or even suggest that Mrs. Binger accepted the Ditto or Replacement Notes as a substitute for the defendants' performance under the Binger Note. Accordingly, Mr. Appel's affidavit statements do not create a genuine issue of material fact.

**b. Stock Transfer Agreement**

**(1) Performance**

 The Stock Transfer Agreement was executed on March, 15, 1993. The recitals,

---

**6.** Pennsylvania courts apply the "plain meaning rule" of interpretation of contracts which assumes that the intent of the parties to an instrument is " 'embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered from the express language of the agreement.' " *Hullett,* 38 F.3d at 111 (citations omitted).

.

which establish the factual predicate underlying this agreement, state:

WHEREAS, on June 23, 1990, [Mrs. Binger] advanced the sum of $1,350,000 to [H.M.A.], in return for which [H.M.A.] executed a Promissory Note (the "Note") in favor of [Mrs. Binger], the payment of which was guaranteed by [Mr. Appel];

WHEREAS, the outstanding principal balance due under the Note as of even date herewith is $825,000;

Based on these recitals the parties agreed to the following:

1. *TRANSFER OF SECURITIES.* For and in consideration of the mutual covenants contained herein, [H.M.A.] does hereby agree to *transfer* to [Mrs. Binger] 48,500 shares (the "Shares") of the common stock of NORTH AMERICAN ENVIRONMENTAL GROUP, INC., a publicly held corporation ("NAE"), free and clear of all liens, levies, restrictions or encumbrances, except as otherwise may be imposed under federal securities laws. (emphasis added).

2. *CONFIRMATION OF OUTSTANDING PRINCIPAL BALANCE.* [Mrs. Binger] does agree to accept the Shares in full consideration of the payment of $445,000 of principal and all accrued interest under the Note so that upon execution hereof, [Mrs. Binger] confirms to [H.M.A.] that the remaining outstanding principal balance due under the Note shall hereafter be $380,000, and that all accrued interest due under the Note through March 1, 1993, shall be deemed satisfied.

Mrs. Binger argues that the Stock Transfer Agreement has not reduced the defendants' obligations under the Binger Note because they have never transferred the NAE stock. She also argues that the defendants' failure to perform justified her recission of the Stock Transfer Agreement.

Defendants do not dispute that the language of the Stock Transfer Agreement is clear and unambiguous—Mrs. Binger was to receive 48,500 NEA shares in exchange for reducing the principal owed by the defendants on the Binger Note by $445,000. They argue that summary judgment is inappropri-

ate, however, because there is a factual dispute concerning whether the defendants "tendered" 48,500 NAE shares to Mrs. Binger which she wrongfully refused the tender of performance, or whether defendants failed to perform and breached the agreement. Defendants base their claim that they have tendered the NAE shares to Mrs. Binger in paragraph 19 of Mr. Appel's affidavit. In that paragraph he states that "[i]t is incorrect that [the defendants] have not tendered the NAE shares to Mrs. Binger," and that Mr. Appel has "made that offer on more than one occasion and have been advised *every time* that the shares are unacceptable because they are not registered with the SEC." (emphasis in original).

The court agrees with the parties that the Stock Transfer Agreement is clear and unambiguous. The agreement expressly provides that H.M.A. and Mr. Appel were to transfer the NAE stock to Mrs. Binger. In return for the transfer of stock, Mrs. Binger was to reduce the amount due under the Binger Note by $445,000, from $825,000 to $380,00, and all accrued interest then due would also be satisfied. Nowhere in the agreement is there any language that indicates that the amount due under the Binger Note would be reduced by the defendants' *tender* of the NAE shares, or is there any other document in the record reflecting such an agreement.

In his deposition testimony Mr. Appel stated that there are two ways to transfer ownership of stock: (1) the owner prepares a document directing the transfer agent for those shares to transfer ownership, or (2) the owner delivers the shares along with a signed stock power. Mr. Appel admitted that under either method "the power to transfer the shares is possessed unilaterally by the owner of the shares." Having established this foundation, Mr. Jackson, the plaintiff's attorney, engaged Mr. Appel in the following colloquy:

Q: At the time that the agreement for the transfer of the shares of North American Environmental Group, Inc. to Mrs. Binger was executed, which is March 15, 1993, was [H.M.A. Investments, Inc.] the owner of those [48,500] shares?

A: Yes.

Q: What efforts, if any, did H.M.A. Investments, Inc. engage in to transfer the shares to Mrs. Binger?

A: I did not send the ·certificate physically to Mrs. Binger. I just—I segregated the shares and had them available for transfer.

Q: We talked earlier about the two techniques could be used to transfer. Did you contact the transfer agent and instruct them to transfer ... ownership from H.M.A. Investments, Inc. to Virginia Binger?

A: No.

Q: Did you provide ... Mrs. Binger or her agents with the power of attorney that you referred to earlier?

A: No.

Q: Did you ever send Mr. Felten or anyone else that acted on her behalf the actual share certificates?

A: [No].

Q: Were those shares ever deposited in her [brokerage] account?

A: No, because the shares were not registered.

It is evident from Mr. Appel's deposition testimony that H.M.A. had the unilateral power to transfer the NAE shares to Mrs. Binger but did nothing to effect transfer other than segregate the shares from H.M.A.'s own shares. Based on these admissions, the court believes that the defendants are being somewhat disingenuous in their argument that there is a factual dispute regarding the parties performance under the Stock Transfer Agreement that makes summary judgment inappropriate. By the clear terms of the agreement, to receive a $445,000 reduction in the amount due the Binger Note the defendants were obligated to transfer the NAE shares to Mrs. Binger; they did not do so.

■ Additionally, Mr. Appel's claim of "tender" in his affidavit is insufficient to create a genuine dispute of material fact that precludes summary judgment. To the extent that his affidavit testimony contradicts his prior sworn deposition testimony the court rejects his affidavit testimony as an attempt to create a sham issue. *See, e.g., Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1365 (8th Cir.1983).

### (2) Rescission

■ On December 9, 1993, almost nine months after the parties executed the Stock Transfer Agreement, Mrs. Binger, through Mr. Felten, rescinded the agreement because the defendants had not transferred the NAE shares of stock as contemplated in the agreement. Mrs. Binger argues that the defendants' failure to perform justified her rescission of the Stock Transfer Agreement. Defendants argue that rescission is not justified because they have not breached the Stock Transfer Agreement.[7]

■ Where no time is fixed for the performance of a contract, performance is required within a reasonable time. *Reagan v. D & D Builders, Inc.,* 277 Pa.Super. 140, 419 A.2d 700, 702 (1980). Reasonableness is determined by consideration of all the existing circumstances. *Id.* In the instant case, H.M.A. possessed the NAE shares and had segregated them. Additionally, not only did Mr. Appel know how to transfer the shares, the defendants had the unilateral power to complete the transfer. Moreover, by the time Mrs. Binger rescinded the Agreement, repayment of the Binger Note was significantly overdue. Under these circumstances, the defendants' failure to transfer the NAE shares by December 9, 1993, unreasonable and Mrs. Binger was entitled to rescind the Stock Transfer Agreement.

### CONCLUSION

As the nonmoving party, defendants had the burden of coming forward with evidence sufficient to create a genuine issue of material fact to support their claims that the Ditto Note, Note Assignment, Modification Agree-

---

**7.** The defendants argue that they have not breached the agreement because there is a dispute concerning whether the parties agreed that NAE or NATK shares were to be transferred to Mrs. Binger. This argument is without merit. It is clear from the record that defendants have neither transferred NAE nor NATK shares to Mrs. Binger. Under either scenario, the defendants have breached the Stock Transfer Agreement.

ment, Replacement Notes, or the Stock Transfer Agreement discharged their obligations under the Binger Note. They failed to do so. On this record, no reasonable jury could return a verdict for the defendants.

The court concludes that there is no genuine issue of material fact and plaintiff is entitled to judgment as a matter of law. Based on the submissions and arguments of counsel, the court finds that plaintiff has a valid and enforceable promissory note in the amount of $1,350,000. The court further finds that defendants' obligations under that promissory note have not been fully satisfied. Defendants remain obligated under the promissory note as follows:

(1) $800,000 in principal;

(2) $229,128.97 in accrued interest;

(3) $50,000 for the second origination fee;

(4) $40,000 for attorneys' fees; and

(5) 358,864 shares of DHRG stock.

Accordingly, **IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**