594 So.2d 491 (1992)
Thomas H. BERGMAN, Trustee, et al.
v.
NICHOLSON MANAGEMENT AND CONSULTANTS, INC.
Consolidated With
Thomas H. BERGMAN, Trustee, et al.
v.
NICHOLSON MANAGEMENT AND CONSULTANTS, INC., et al.
Nos. 90-CA-1257, 90-CA-1258.
Court of Appeal of Louisiana, Fourth Circuit.
January 30, 1992.
Rehearing Denied March 18, 1992.
*493 Ryan & Willeford, James F. Willeford, Diane K. Zink, New Orleans, for plaintiffs/appellants.
Gordon, Arata, McCollam & Duplantis, Ewell E. Eagan, Jr., Willard H. Henson, New Orleans, for defendants/appellants, Nicholson Management & Consultants, Inc. and Anthony J. Nicholson.
Before SCHOTT, C.J., and WILLIAMS and ARMSTRONG, JJ.[*]
WILLIAMS, Judge.
Plaintiffs appeal from the trial court's rulings on exceptions to the hearing commissioner's report. Principally, plaintiffs contend the trial court erred by denying their claim for waste of the property against codefendant Anthony Nicholson individually and by denying their claim against Nicholson on a continuing guaranty. Defendants answer the appeal and assign errors. Upon finding the trial court did not commit manifest error, we affirm.

FACTUAL AND PROCEDURAL HISTORY
On December 28, 1984, Thomas H. Bergman, trustee of the Stewart Children Trust and United Department Stores Company No. 1 (plaintiffs), sold and conveyed "Orleans East Apartments" and its furnishings to Nicholson Management and Consultants, Inc. (NMC), a Florida corporation wholly owned by Anthony Nicholson. The credit sale created an in rem mortgage in favor of plaintiffs, which was acknowledged in the act of credit sale as inferior to a mortgage on the property existing in favor of Mutual Insurance Company of New York (MONY).
In consideration of the credit sale, NMC tendered to plaintiffs $25,000, less certain credits, and executed two promissory notes dated December 28, 1984 payable to plaintiffs. The first note was for the amount of $475,000 and due in 90 days, and the other was a non-recourse note for the amount of $3,500,000 and payable in 180 consecutive monthly installments commencing February 1, 1985 and ending on December 1, 1999. Under the terms of the $3,500,000 note and the act of credit sale, in the event of default on any installment, the entire principal indebtedness and all accrued interest came due. As security for the downpayment, Nicholson gave his personal continuing guaranty up to the principal amount of $475,000, plus all interest, attorney's fees and costs.
The act of credit sale and the promissory notes were executed by Nicholson as president of NMC. Nicholson, who was the sole owner, director and officer of NMC, asserted that he had full authority to purchase and mortgage the property. He, nevertheless, *494 agreed to have NMC's secretary deliver to plaintiffs a corporate resolution confirming his authority. This delivery did not occur until discovery in this action commenced.
On February 7, 1985, NMC requested an extension of time to pay the $475,000 note. Plaintiffs granted the extension. In return, Nicholson and NMC executed on May 2, 1985 an agreement to maintain and repair the apartments. On June 4, 1985, Nicholson sent his personal check in the amount of $423,468.52 which, together with credits and adjustments, paid the $475,000 note.
A ground lease of the land on which the property subject to the credit sale was situated was also executed on December 28, 1984. It provided for an annual guaranteed rent of $80,000.
Nicholson's attorney, Charles Rosen, tendered the property back to plaintiffs at the end of 1985, alleging redhibitory defects. NMC, thereafter, defaulted on the ground lease, the MONY mortgage and the $3,500,000 note in January of 1986. Nicholson also failed to pay both the principal and interest on a promissory note payable to plaintiffs in the sum of $10,000. Payment was due on this note in full on November 1, 1986, with 9% per annum interest from October 23, 1985 until paid and reasonable attorney's fees upon forced collection.
As the corporate resolution had not been tendered to plaintiffs by NMC or Nicholson, so that it was not of record, executory process was not available. The parties, therefore, attempted to resolve their differences without litigation. Nicholson's attempt to refinance failed. Additionally, a proposed dation en paiement between the parties, set for June 1986, never materialized.
Plaintiffs viewed the property in June 1986 and apparently were shocked at its condition. Subsequently, as per the terms of the credit sale, plaintiffs issued a notice of assignment of rents to the property's tenants. The tenants became confused and unruly over this change of events. Hence, Nicholson resumed collection of rents. When further attempts at resolving the parties' differences failed, plaintiffs exercised a second assignment of rents.
On September 4, 1986 Bergman as trustee filed suit for past due rent (No. 86-15904) and for a money judgment and to enforce a mortgage via ordinary and injunctive relief (No. 86-15903) against NMC and Nicholson. The suits were consolidated for trial. In October 1986, plaintiffs with the concurrence of Nicholson, hired an independent company to manage the property. On July 16, 1987, the consolidated suit was amended, naming the department store and the children individually as plaintiffs.
Defendants answered No. 86-15903, denying liability and avering defenses of error and/or mistake, estoppel and waiver, and extinguishment of the obligation. Defendants also filed a reconventional demand seeking recission of the sale due to hidden defects and damages for negligence by invoking the assignment of rents provision of the credit sale. Defendants answered No. 86-15904, denying liability and averring the affirmative defenses of accord and satisfaction, extinguishment of obligation, estoppel, error and/or mistake, and assumption of risk.
While plaintiffs were attempting to foreclose through ordinary proceedings, MONY judicially sold the property on February 19, 1987 at a sheriff's sale for $950,000 to New Concept Housing, Inc., satisfying the first mortgage. As a result, plaintiffs lost their in rem mortgage and their ground lease (valued at $919,987.96).
The consolidated case was tried before Commissioner Avis Marie Russell on January 17, 18, 19 and 23, 1989. Her written report and findings were filed on November 8, 1989, in accordance with LSA-R.S. 13:1171(G). First, she found defendants' reconventional demand claim of redhibition had not prescribed because, at the time of the sale, Nicholson believed the property's termite infestation had been eradicated. She concluded that the first notice defendants had of the termite infestation was when the formosan termites swarmed sometime between January 6, 1986 and July 6, 1986, which was within a year of *495 the filing of the redhibition claim. The commissioner nevertheless recommended denying the claim because the credit sale of the property was without warranties.
Second, the commissioner found Nicholson's continuing guaranty of $475,000 was extinguished when he gave his personal check of $423,468.52, with off-setting credits due him, to satisfy the promissory note for $475,000. She found the language of of the guaranty clearly stated Nicholson's liability up to $475,000. Thus, she concluded that his payment of that amount extinguished his guaranty even though plaintiffs did not receive written notice of the discontinuance of the continuing guaranty, citing Trane Co. v. Christina, 260 So.2d 62 (La.App. 4th Cir.1972).
Third, Commissioner Russell found Nicholson personally liable to plaintiffs on the $10,000 demand note, with 9% interest from October 23, 1985 until paid, and reasonable attorney's fees. Fourth, she found NMC liable in contract and tort for wasting the premises. Under the provisions of the credit sale and the ground lease, she concluded that the purchaser (former) and lessee (latter) were obligated to maintain the property and keep it in good repair, and not waste or damage it. Photographs taken in June 1986 and a videotape taken in October 1986, however, showed "the property deteriorated unbelievably." The commissioner noted that glass and fences were broken, walls were mildewed, water was left standing, electrical sockets were exposed, sheet rock was missing, the grounds were unkept, etc. The commissioner concluded that "[i]n general, the apartment complex look[ed] as if there had been no effort to maintain the property or keep it in good repair." The commissioner further found the property was not properly managed and the rent rolls were inaccurate. She concluded that plaintiffs clearly established that "the purchaser and lessee were negligent and also breached the provisions contained in the Act of Sale and Ground Lease."
The commissioner also found Nicholson liable in tort (negligence) because he was aware of the property's deterioration, yet failed to authorize the purchase of equipment and materials for ordinary repairs. The commissioner did not find him liable in contract, however, since she found he had not intentionally caused the corporation to breach its contractual obligations, the corporation was not a sham (the corporate veil was not pierced), he had not exceeded his authority (the corporate resolution existed), and he had not perpetuated a fraud on plaintiffs (the corporate resolution existed). After determining that the cost of repairing the property was $2,000,000, the commissioner concluded that the amount of tort and contract damages suffered by plaintiffs for its waste was $2,000,000.
Finally, on the reconventional demand, the commissioner found plaintiffs did not act fraudulently or in bad faith, the property had no latent defects which plaintiffs failed to reveal to defendants, the property's plumbing and air conditioning problems were the result of improper maintenance, and plaintiffs were not negligent in seizing rents.
Commissioner Russell, therefore, recommended the entry of 1) judgment denying the peremptory exception raising the objection of prescription on the reconventional demand; 2) judgment in favor of plaintiffs and against Nicholson on the $10,000 demand note, with interest at 9% per annum until paid plus attorney's fees of $2,000; 3) judgment in favor of plaintiffs and against Nicholson and NMC, in solido, in the amount of $1,050,000 with legal interest; 4) judgment dismissing the reconventional demand(s) and 5) judgment of each party bearing their own costs.
Both sets of parties excepted to the commissioner's report.[1] First, the trial court's reasons for judgment addressed plaintiffs' claim that the commissioner erred by not finding Nicholson remained personally obligated *496 under the continuing guaranty for $51,131.48 in principal plus all interest due on the $3,500,000 note at 9% from December 28, 1985 until paid, because the credits used to offset payment of the $475,000 note were owed by plaintiffs to NMC and not to Nicholson. Plaintiffs also claimed Nicholson's guaranty had not been terminated because there was no written notice of termination. The trial court found, however, that the credits were owed by plaintiffs to Nicholson. Consequently, it found Nicholson's continuing guaranty was extinguished by his payment of the full amount he owed under the terms of the guaranty.
Next, the trial court considered Nicholson's personal liability beyond the continuing guaranty. Plaintiffs complained that the commissioner erred by not piercing the corporate veil, while Nicholson claimed the commissioner erred by binding him in solido with NMC since the corporate veil had not been pierced. After reviewing the claims, the trial court determined it could not hold Nicholson personally liable for NMC's debt to plaintiffs as they did not prove he intentionally or fraudulently caused the corporation to breach the contractual obligations it owed to them.
Further, the court confirmed the existence of the corporate resolution which authorized Nicholson to act on NMC's behalf. Thus, it concluded that Nicholson had not exceeded his authority or perpetuated a fraud about his authority to act on behalf of NMC. Additionally, the trial court found NMC was not Nicholson's alter ego, as evidence established that NMC was a separate and distinct entity from Nicholson. It, therefore, concluded that the commissioner erred by finding Nicholson solidarily liable with NMC for damages resulting from the breach of act of sale and ground lease.
The trial court affirmed that no evidence showed plaintiffs intentionally or fraudulently concealed any latent defects and, therefore, dismissed NMC's reconventional demand. Finally, the trial court addressed the parties' exceptions concerning the commissioner's calculations of damages. The court noted the commissioner determined the cost of repairing the property was $2,000,000 and presumed the commissioner deducted sums from that amount. The trial court indicated, however, that deductions are appropriate only to the extent to which the property is enhanced. Hence, as the value of the property was not enhanced, the trial court concluded that no deductions were warranted and held NMC liable to plaintiffs in the amount of $2,000,000 plus interest from the date of judicial demand.
The trial court, therefore, entered judgment on April 3, 1990 in favor of plaintiffs and against NMC on the issue of NMC's negligence and breach of contract. NMC was ordered to pay plaintiffs $2,000,000 plus interest from date of judicial demand. On the issue of Nicholson's negligence and breach of contract, however, the trial court entered judgment in his favor. Judgment was also entered in favor of plaintiffs and against Nicholson individually on the demand note in the amount of $10,000 plus interest, costs, and $2,000 attorney's fees. Defendants were then cast with the cost of the proceedings and ordered to pay $6,000 each to two expert witnesses.
On appeal, both sets of parties assign errors. Plaintiffs claim the trial court erred in holding 1) Nicholson extinguished his continuing guaranty by paying with his personal funds $423,000, even though no demand under the guaranty had been made, no release had been given, additional principal, interest, costs and attorney's fees were owed by debtor and the contract of guaranty did not provide for such extinguishment; 2) Nicholson was immune from liability for his personal negligence due to his corporate status; 3) Nicholson was immune from personal liability because a corporate resolution was found which appointed him agent for the purposes of the transaction and 4) NMC was not Nicholson's alter ego. Conversely, defendants claim the trial court erred 1) by failing to tax costs and fees proportionately to the amount in which each party was cast in judgment, especially as the expert's testimony bore no relation to the sole issue on which Nicholson was held liable; 2) in holding that NMC was liable for negligent waste of the property and for breach of the *497 credit sale and 3) in dismissing defendants' reconventional demand of redhibition.

CONTINUING GUARANTY
Contracts of guaranty, which are engagements to answer for the indebtedness of another, are governed by the Civil Code articles regulating suretyship. LSA-C.C. art. 3035 et seq. At the time of the making of Nicholson's continuing guaranty, LSA-C.C. art. 3035 provided:
Suretyship is an accessory promise by which a person binds himself for another already bound, and agrees with the creditor to satisfy the obligation, if the debtor does not. (1870)
A continuing guaranty remains in full force and effect until revoked by the guarantor, expressly or impliedly, or its effectiveness is extinguished in some other mode recognized by law. Bonura v. Christian Bros. Poultry Co. of Gretna, Inc., 336 So.2d 881 (La.App. 4th Cir.1976), writ den., 339 So.2d 11, 26 (La.1976); Pat S. Todd Oil Co., Inc. v. Wall, 581 So.2d 333 (La.App. 3d Cir.1991), writ den., 585 So.2d 569 (La.1991); Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App.2d Cir.1987), writ den., 506 So.2d 1231 (La.1987). Hence, the extinction of the principal obligation extinguishes the suretyship. LSA-C.C. art. 3059 (1988). The surety's payment of the total sum which he obligated himself to pay extinguishes the suretyship. See Trane Co. v. Christina, supra. Or, the surety's notice to the creditor may terminate the suretyship. LSA-C.C. art. 3061 (1988). This termination or discontinuance, however, does not affect the surety's liability for obligations already incurred by the principal obligor. See Id. The discontinuance relieves the surety only of liability for future loans. First Acadiana Bank v. Bieber, 582 So.2d 1293 (La.1991).
The continuing guaranty executed by Nicholson, dated December 28, 1984, set forth the following:
In consideration of ..., I hereby give this Continuing Guaranty to said Sellers [plaintiffs] ... for the payment in full, together with all interest, additional interest, fees and charges of whatsoever nature and kind, of any indebtedness, direct or contingent whether secured or unsecured of said Debtor [NMC], to Lender [plaintiffs] up to the principal amount of ... $475,000.00 ... plus all interest, attorney's fee, costs, etc., which may be incurred by said Debtor, whether due or to become due, and whether now existing or hereafter arising.
* * * * * *
It is expressly agreed that this Continuing Guaranty is absolute and complete,... and the same shall continue in force until written notice of its discontinuance shall be served upon one of the executive officers of Sellers, or the payment of the Notes, but such discontinuance shall not affect my liability or any debts and/or obligations of the Debtor than (sic) existing nor the liability of any other party in the Premises; nor shall any notice of its discontinuance affect my liability as full Guarantor on any commitment then in force by Sellers to said Debtor and I shall remain liable for all such indebtedness advanced by Sellers pursuant to such commitment.
On appeal, plaintiffs claim the trial court erred by holding Nicholson could extinguish his continuing guaranty by unilaterally paying the principal amount of the limit of the guaranty. They claim this hindered their commercial options for protecting the collection of the debt and unfairly allowed Nicholson to direct the application of his payment to the guaranteed portion of NMC's debt. We disagree.
A review of the facts show both the $475,000 note and the non-recourse $3,500,000 note were dated December 28, 1984. The $475,000 note was due on April 1, 1985, while the $3,500,000 note was payable in 180 consecutive monthly installments commencing February 1, 1985. On February 7, 1985, NMC requested an extension for the payment of the $475,000 note. Further, plaintiffs' brief admits that on June 4, 1985, Nicholson sent his personal check in the amount of $423,468.52 with the restrictive notation "payment in full on down payment for Orleans East Apartments," *498 and that Nicholson's check paid the amount due under NMC's $475,000 note when it was combined with the $51,531.48 in net credits. Finally, NMC did not default on the $3,500,000 note until January 1, 1986.
First, because it is not clearly wrong, we cannot disturb the trial court's factual finding that the credits were issued to Nicholson. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). Our disagreement with its factual finding, alone, is not grounds for substituting its judgment with our own. Id.; Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081 (La.1983). Thus, as the conclusion of trial court is not manifestly erroneous, it must be affirmed.
Next, as the language of the guaranty evinces the guarantor's intent to secure "any indebtedness, direct or contingent whether secured or unsecured" the trial court did not manifestly err, as Nicholson contends, by failing to limit his liability to any particular debt instrument, namely the $475,000 note. See Guaranty Bank of Mamou v. Community Rice Mill, Inc., 502 So.2d 1067 (La.1987), n. 5. Nor did the trial court manifestly err by finding the effectiveness of the continuing guaranty extinguished by Nicholson's personal payment of $423,468.52, when it was combined with the extended credits.
Nicholson unequivocally guaranteed to satisfy NMC's obligation(s) to plaintiffs "up to the principal amount of ... $475,000.00... plus all interest, attorney's fees, costs, etc." Thus, when he paid the total sum due under the $475,000 note, following NMC's (the primary obligor) notice to plaintiffs that it was unable to timely pay the balance due under the note, but before plaintiffs made forced collection on it, his payment satisfied his obligation to plaintiffs. His suretyship was extinguished by his payment of the total sum which he obligated himself to pay on NMC's indebtedness. Moreover, after accepting Nicholson's payment in satisfaction of the $475,000 note, plaintiffs cannot complain that Nicholson hindered their commercial options.
Additionally, although we note that Nicholson requested the return of the guaranty after his check was negotiated, the terms of the guaranty did not require him to tender to plaintiffs written notice of its fulfillment or extinguishment. Rather, the contract asserted that, until fulfilled, the suretyship would continue in force for the security of future debts until plaintiffs were issued written notice of its discontinuance. Such written notice, however, would not have affected his liability as guarantor on any commitment then in force. It would have affected his liability only as to future debts incurred by NMC.
Finally, plaintiffs claim Nicholson continues to be liable for NMC's $3,500,000 note and for all interest, attorney's fees and costs due under that note. We disagree.
Nicholson's guaranty obligated him to pay interest, fees and costs only on the guaranteed portion of NMC's debt, i.e., the principal sum of $475,000, and not on the entire principal of both of NMC's promissory notes to plaintiffs. See Guaranty Bank of Mamou v. Community Rice Mill, Inc., supra.[2] Thus, as plaintiffs admit the $475,000 note was satisfied on June 4, 1985, and as the interest, attorney's fees or costs flowing from the tardy payment of that note is not an issue, the interest, fees and cost clause of the guaranty did not prevent its extinguishment.

TORT LIABILITY
Plaintiffs claim the trial court erred by finding Nicholson immune from tort liability for the waste of the property. Nicholson, *499 however, claims he bargained for and obtained limits on liability. If he is held personally liable, he claims both the structure of their business relationship and the contractual and corporate limitations on his liability will have been disregarded.
The general rule that corporations are distinct legal entities, separate from the individuals who comprise them, is statutory in origin and supported by jurisprudence. LSA-R.S. 12:93(B); LSA-C.C. arts. 435, 436, 437; Riggins v. Dixie Shoring Co., Inc., 590 So.2d 1164 (La.1991). Except for a few limited and generally consent based exceptions[3], contract duties are owed strictly by and to the parties to the agreement. LSA-C.C. arts. 1983, 1985; Morris, "Business Associations," 50 La. L.Rev. 211 (1989), ns. 30, 34. Thus, a disclosed agent such as a corporate president, acting within his authority, is not liable for the performance of the principal/corporation's contracts. See 50 La.L.Rev. at n. 34, citing LSA-C.C. arts. 3012 and 3013.[4] Any fault on the part of the agent in conducting or fulfilling the contract, is chargeable to the principal/corporation. Riggins v. Dixie Shoring Co., Inc., supra.
Nicholson negotiated and signed the contract(s) in the disclosed capacity of president of NMC. Thus, the trial court properly found he is not personally liable for the performance of NMC's contract(s). Alternatively, plaintiffs want liability imposed under a tort theory because NMC's corporate performance under the contract was dependent upon the behavior of Nicholson, the sole shareholder and officer in the corporation.
The duty imposed, however, to prevent the waste of the property, depended on NMC and plaintiffs' contractual consent for its existence. This contractual duty was owed only by NMC because only NMC agreed to owe the duty.[5]Cf. 50 La.L.Rev. at 221.
Corporations, which are legal entities, act only through their employees, officers and agents. As plaintiffs knew Nicholson was NMC's sole shareholder and officer, they were cognizant that the fulfillment of NMC's contractual obligations were, more likely than not, dependent upon his personal conduct. Nevertheless, plaintiffs negotiated and alotted liability between themselves and NMC. Thus, in the event of breach of contract, such as wasting the property, liability fell only upon NMC.
Consequently, as the breach of an independent tort duty is not involved, such as the breach of duty to exercise care to avoid injury to third persons, Nicholson's fully disclosed agency status shielded him from personal liability. See Canter v. Koehring Co., 283 So.2d 716 (La.1973); 50 La.L.Rev. at 221. The parties negotiated liability. Tort theories cannot be used to circumvent the affects of their bargain turned sour.

PIERCING THE VEIL
Corporations are distinct legal entities, separate from the individuals who comprise them. LSA-R.S. 12:93(B); LSA-C.C. art. 435, 436, 437. Consequently, a corporation's shareholders are not liable for its debts. Riggins v. Dixie Shoring Co., Inc., supra. This shareholder liability shield encourages business investments and industry because the shareholder's personal wealth is insulated from the risks inherent in business. Riggins v. Dixie Shoring Co., Inc., supra.; Smith v. Cotton's Fleet Service, Inc., 500 So.2d 759 (La.1987). Due to the beneficial role of this shield, only in exceptional circumstances is the shareholder's limited liability disregarded. *500 Riggins v. Dixie Shoring Co., Inc., supra.
An exception to this shield is the "alter ego" concept, where the corporation is simply the alter ego of the shareholder. Before the corporate entity will be disregarded on this basis, however, proof of fraud or deceit, practiced by the shareholder when acting through the corporation, is usually required. LSA-R.S. 12:95; Id. Another exception arises when the shareholder disregards the corporate entity to the extent where the individualities of the corporation and shareholder cease to exist. Id.; Liberto v. Villard, 386 So.2d 930 (La. App. 3d Cir.1980).
Ownership of stock by the sole shareholder or by a majority stockholder, is insufficient to hold the shareholder liable for corporate debts. LSA-R.S. 12:21; Riggins v. Dixie Shoring Co., Inc., supra. The totality of the circumstances must support piercing the veil. See Id. Furthermore, to succeed on such a theory, it behooves the claimant to show that piercing the veil will prevent corporate form from being used to defraud creditors. See Id.
Plaintiffs claim the trial court erred by finding the evidence did not warrant piercing the corporate veil and holding Nicholson liable as a shareholder. We disagree. Nicholson did not create NMC to defraud plaintiffs. He formed the corporation years prior to the parties' business venture. He fully disclosed that NMC was thinly capitalized, he was its sole shareholder and director and he was acting as its agent. In their haste to complete the sale, plaintiffs elected to proceed without having possession of the corporate resolution. Under these circumstances, the trial court properly found plaintiffs failed to prove Nicholson acted fraudulently. Therefore, its finding that NMC is not Nicolson's alter ego is not clearly wrong and must be affirmed. Sistler v. Liberty Mutual Ins. Co., Inc., supra.
Additionally, the trial court found the testimony of Nicholson and NMC's accountant, Martin Prague, established that NMC was a separate and distinct entity from Nicolson. While noting that NMC may not have followed all the formalities of corporate record keeping, it supported its conclusion with the following findings of fact: First, Nicholson and NMC filed separate income tax forms; second, the IRS had audited NMC several times; third, NMC's tax returns showed that it had operated profitably; fourth, NMC was duly organized as a Florida corporation; fifth, NMC and Nicholson maintained separate bank accounts; sixth, Nicholson's loans to NMC were documented; and seventh, withdrawals from NMC paid to Nicholson were legitimate reimbursements. Based upon the foregoing, the court's factual finding is not clearly wrong. Therefore, it cannot be disturbed on appeal. Sistler v. Liberty Mutual Ins. Co., supra.

CORPORATE RESOLUTION
The trial court confirmed the existence of NMC's resolution, found it authorized Nicholson to act on its behalf during NMC's business dealings with plaintiffs and concluded Nicholson had not exceeded the authority granted by the resolution.[6] As these findings are reasonable in light of the record viewed in its entirety, the trial court's judgment must be affirmed. Sistler v. Liberty Mutual Ins. Co., supra.

COSTS
Nicholson claims the trial court erred by conjointly taxing him and NMC with $12,000 for expert witness fees. He was found liable only on the $10,000 note and the experts' testimony pertained to NMC's liability for the waste of the property. Consequently, he claims NMC should be solely liable for those fees.
The trial court has wide discretion in taxing costs. Purcell v. State Farm Ins. Co., 417 So.2d 16 (La.App. 4th Cir. 1982); Pittman v. Administrators of Tulane *501 Educational Fund, 521 So.2d 690 (La.App. 1st Cir.1988). LSA-C.C.P. art. 1920 provides,
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
Thus, costs may be assessed in any manner which the court deems equitable, and may be reversed only upon showing an abuse of discretion. Id. As no abuse has been shown, the court's assessment must be affirmed.

NMC'S LIABILITY FOR WASTE
On appellate review, the trial court's reasonable factual findings, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La. 1987); Sistler v. Liberty Mutual Ins. Co., supra. Where there are two permissible views of evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Consequently, as the record supports the trial courts finding that NMC breached its contract(s) with plaintiffs by allowing the property to deteriorate, its finding is not clearly wrong. It must, therefore, be affirmed.

NMC'S REDHIBITION CLAIM
NMC claims the trial court erred by denying its claim for redhibition because plaintiffs fraudulently conveyed to them termite infested and water damaged property. We disagree.
Our review of the record supports the trial courts findings of fact and evaluations of credibility as reasonable. Therefore, as this court is not empowered to substitute our own judgment for that of the trial court, even if we would have weighed the evidence differently, we must affirm the lower court's judgment. Sistler v. Liberty Mutual Ins. Co., supra.
For the reasons assigned, the judgment of the trial court is affirmed. The parties are to bear their own appellate costs.
AFFIRMED.
SCHOTT, C.J., and ARMSTRONG, J., concur in the result.
NOTES
[*] Due to the retirement of Judge David R.M. Williams prior to rendition, but after their concurrences herein, this opinion is rendered unanimously by Judges Schott and Armstrong.
[1] Louisiana's three-tiered court system allocates the fact-finding function to trial courts. Duroncelet v. Doley, 530 So.2d 653 (La.App. 4th Cir. 1988), writ den., 533 So.2d 22 (La.1988). Hence, the trial court is required to make a de novo determination of the commissioner's disputed findings. Id.
[2] Under terms similar to those contained in Nicholson's guaranty, on the issue of interest, attorney's fees and costs, the trial court in Community Rice Mill rendered judgment against the guarantors only on the guaranteed portion of the principal debt and not upon the entire principal debt. The appellate court, however, found the guaranty discharged and dismissed the suit against the guarantors. The supreme court reversed finding the continuing guaranty still enforceable and remanded for the appellate court to decided whether the guarantors' liability only extends to the guaranteed portion of the principal debt. To date, the appellate court has not rendered a decision.
[3] LSA-C.C. arts. 1978-1982, 1821-1830, 1879-1887, 1984, 2642-2654.
[4] For the mandatary, who has communicated his authority to a person with whom he contracts in that capacity, is not answerable to the latter for anything done by it, unless he has entered into a personal guarantee, LSA-C.C. art. 3012. The mandatary is responsible to those with whom he contracts, only when he has bound himself personally, or when he has exceeded his authority without having exhibited his powers. LSA-C.C. art. 3013.
[5] Plaintiffs also claim the trial court erred in not finding him contractually bound, through ancillary documents such as his $475,000 guaranty, for the waste of the property. The documents cited by plaintiffs are insufficient to support their claim.
[6] LSA-C.C. art. 3013 provides: The mandatary is responsible to those with whom he contracts, only when he has bound himself personally, or when he has exceeded his authority without having first exhibited his powers.